# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

**FILED**

**September 2, 1998**

**Cecil W. Crowson**
**Appellate Court Clerk**

JENNIFER O. WILSON (OAKLEY),  )
  )
          Plaintiff/Appellant,  )
  )     Appeal No.
  )     01-A-01-9707-CV-00325
VS.  )
  )     Davidson Circuit
  )     No. 96D-1850
LARRY ARNOLD WILSON,  )
  )
          Defendant/Appellee.  )


APPEALED FROM THE CIRCUIT COURT OF DAVIDSON COUNTY
AT NASHVILLE, TENNESSEE

THE HONORABLE MURIEL ROBINSON, JUDGE



J. RUSSELL HELDMAN
320 Main Street, Suite 101
Franklin, Tennessee 37064

JOHN E. HERBISON
501 Union Street, Suite 500
Nashville, Tennessee 37219
          Attorneys for Plaintiff/Appellant

EARL J. PORTER, JR.
214 Third Avenue North
Nashville, Tennessee 37201

THOMAS F. BLOOM
500 Church Street, Fifth Floor
Nashville, Tennessee 37219
          Attorneys for Defendant/Appellee


AFFIRMED AS MODIFIED
AND REMANDED


BEN H. CANTRELL, JUDGE

CONCUR:
TODD, P.J., M.S.
CAIN, J.

# O P I N I O N

In a documentary on how to complicate a simple divorce, this case would serve as a highlight film. After the trial court finally entered a final judgment, the parties on appeal argue about the trial judge's refusal to recuse herself, a pre-nuptial agreement, the division of marital property, the award of attorney's fees, and certain injunctions involving the custody and visitation with the parties' minor child. We modify the judgment to give Dr. Oakley a $2,000 credit for her separate property awarded to Mr. Wilson and to make the judgment for attorney's fees run to Mr. Wilson instead of his lawyer. In all other respects we affirm the judgment below.

## I.

Dr. Jennifer Oakley, a Nashville gynecologist, married Larry Wilson, a pilot and flight instructor, on August 29, 1989. Both parties had been married before. Dr. Oakley had a five year old son from a former marriage and one of Mr. Wilson's prior marriages produced one son, who was fifteen in 1989. Mr. Wilson adopted Dr. Oakley's son in 1991.

Mr. Wilson worked for a company in Smithville until 1991, when he left it to devote all his time to the family. The trial judge found that after 1991, Mr. Wilson was essentially a house husband. The two families apparently blended well together. Dr. Oakley formed a close relationship with Mr. Wilson's son; Mr. Wilson and his adopted son were constantly together, and a strong bond formed between them.

All of this family bliss ended in 1995 or in the first part of 1996. Dr. Oakley filed a complaint for divorce on June 21, 1996. The initial pleading did not presage the bitterness to come. The complaint simply alleged that the parties were

experiencing irreconcilable differences and that she anticipated they would enter into a marital dissolution agreement. Below the surface, however, the relationship had turned ugly. On July 11, 1996 Mr. Wilson filed an answer and counter complaint alleging that Dr. Oakley was guilty of inappropriate marital conduct. He sought custody of the minor child and an equitable division of the marital property. He alleged that Dr. Oakley had set out to destroy his relationship with his adopted son.

Both parties sought various restraining orders, and the court set a hearing for August 22, 1996. At that hearing the bitterness took over and set the tone for all of the proceedings that followed. After hearing some of the proof, the court continued the hearing to August 30, 1996 but entered an interim order containing the following provisions:

> 1.      That a restraining order issue enjoining and restraining both parties from harassing each other;
> 2.      That a restraining order issue enjoining and restraining either party from wiretapping the parties' home telephones;
> 3.      That a restraining order issue enjoining and restraining MRS. WILSON from interfering with the child's visitation with MR. WILSON;
> 4.      That a restraining order issue enjoining and restraining MRS. WILSON from attempting to alienate the affections of the child from MR. WILSON;
> 5.      That a restraining order issue enjoining and restraining the parties from having a gun around the child or in the house;
> 6.      That the child will not sleep with MRS. WILSON but will be in his own bed;
> 7.      That MRS. WILSON shall return MR. WILSON'S automobile and the boat and jet skis to the residence of the parties and that the parties are enjoined and restrained from disposing of these items;
> 8.      That MR. WILSON will take the child immediately following the hearing to have dinner with him and return him home by 8:00 P.M.

The court had orally found at the end of the August 22 hearing that Mr. Wilson should be allowed to take the child to dinner that night and return him to his mother by 8:00 P.M. The parties were strictly enjoined not to discuss the divorce with the child.

The court resumed the hearing on August 30. The charges and counter charges grew in substance and tone. But at the conclusion of the hearing the trial judge entered an order containing the following:

> At the conclusion of all testimony, the Court made a finding of fact that Mrs. Wilson has set upon a course of conduct to alienate the child from Mr. Wilson. The Court further finds that the child has been alienated by Mrs. Wilson. The Court further established specific visitation for Mr. Wilson and enjoined the parties from alienating the affections of the child toward either parent and from discussing the divorce case or any past conduct of the parties in the presence of the child.

> It is, therefore, ORDERED, ADJUDGED and DECREED that a restraining order issue enjoining and restraining the parties from attempting to alienate the affection of the child from either parent.

> It is further ORDERED that both parents are enjoined and restrained from discussing this divorce case or custody issues with the child and from discussing any past conduct of the other in the presence of the child.

> It is further ORDERED that Mr. Wilson will be specifically enjoined and restrained from insulting or "butt-facing" the child.

> It is further ORDERED that Mrs. Wilson will be specifically enjoined and restrained from interfering with Mr. Wilson's visitation. She will further be enjoined from having her father or other relatives from interfering with this Court ordered visitation. Further, Mr. and Mrs. Wilson will both be enjoined from threatening or physically abusing each other.

> It is further ORDERED that Mr. Wilson will have visitation with the minor child every other weekend from Friday at 6:00 p.m. until Sunday at 6:00 p.m., to commence on Friday, September 6, 1996.

> It is further ORDERED that Mrs. Wilson will have visitation over the Labor Day holiday. Mr. Wilson shall have Thanksgiving visitation beginning on Thanksgiving Eve from 8:00 a.m. until 9:00 p.m. If the child is in school on Thanksgiving Eve, Mr. Wilson will pick him up at school for Thanksgiving Eve dinner and deliver him to Mrs. Wilson to have the child from Thanksgiving Eve through Thanksgiving Day.

> It is further ORDERED that the child will be with Mr. Wilson one week before Christmas until 8:00 p.m. on Christmas Eve, at which time the child will be in Mrs. Wilson's care from 8:00 p.m. Christmas Eve through Christmas Day and the week thereafter.

At this point Dr. Oakley changed lawyers. Both parties filed petitions for contempt, but the contempt proceedings bogged down in procedural difficulties when Dr. Oakley demanded a jury and insisted that a special prosecutor be appointed under Rule 42, Tenn. R. Crim. Proc. The trial judge refused both motions but granted Dr. Oakley an interlocutory appeal under Rule 9, Tenn. R. App. Proc.

Dr. Oakley then changed lawyers again and moved the trial judge to recuse herself. The trial judge overruled the motion, and Dr. Oakley filed a petition in the juvenile court alleging that the child was in danger of suffering immediate and irreparable harm if he were required to go through unsupervised visitation with Mr. Wilson. The juvenile court heard proof and ruled as follows:

> The petitioner, the child, and the child's aunt, all testified at the preliminary hearing. At the conclusion of their testimony, the Court advised the petitioner that the facts testified to by the witnesses would not support the type of extraordinary relief that they were seeking. The requirements for such an emergency order prior to a full adjudicatory hearing are extremely strict. The evidence regarding the risk to the child was simply not of the level that the legislature requires for this Court to enter such an emergency order. In this respect, the Circuit Court has much more flexibility in entering such pendente lite orders under its divorce jurisdiction than this Court has under its dependent and neglect jurisdiction.

Dr. Oakley then dropped one of her attorneys and added another in his place. The case lurched along toward a final hearing in April of 1997. Dr. Oakley renewed her motion for recusal, and the court denied it. After the final hearing, the court granted the parties a divorce pursuant to Tenn. Code Ann. § 36-4-129, although the court found that Dr. Oakley bore the greater degree of fault. The court divided the marital property, awarded custody of the child to Dr. Oakley, with specific visitation for Mr. Wilson, and enjoined Dr. Oakley (1) to refrain from interfering with the visitation and (2) to refrain from attempting to alienate the child's affections for his father. The order also directed Mr. Wilson to pay child support and denied him any alimony except for $15,000 in attorney's fees.

After the trial, Dr. Oakley's trial attorney withdrew and was replaced by the seventh separate attorney to represent her in this litigation. New counsel made a motion for a new trial and carried the effort to disqualify the trial judge to the presiding judge of the Davidson County trial courts. The presiding judge denied the application.

## II.

## Recusal

On appeal Dr. Oakley seeks a reversal of each of the trial judge's adverse findings on the ground that the trial judge was biased and prejudiced against her. Five specific instances of misconduct are cited as the basis for the conclusion that this court should reverse the trial court's orders.

**(1)** At the August 22, 1996 hearing Mr. Wilson's lawyer alleged in his opening statement that Dr. Oakley had set out on a definite course of action to poison the child's mind. At that point the trial judge interrupted and directed the court reporter to go off the record. During the off-the-record discussion, the judge referred to a recent decision in the Court of Appeals in *Varley v. Varley*, 934 S.W.2d 659 (Tenn. App. 1996), in which the trial judge (the same trial judge hearing this case) was upheld in awarding custody to the father. In a hearing on January 10, 1997 on Dr. Oakley's motion for recusal, the following exchanges took place:

> Q. (By Mr. Sanderson) Go ahead if you will Dr. Oakley, tell her Honor exactly what your feelings were and what you recited in writing?
>
> A. Initially on August 22nd Mr. Porter was making his opening remarks and he got to a point in his statement where he said that he accused me of poisoning the child's mind. At which point Your Honor went off the record and motioned for the court transcriptionist to quit typing and you said to Mr. Porter, was he aware that you could take the child away from the mother and you pointed towards me and give to the father and pointed towards Mr. Wilson

and you further cited a case, which I have come to find out it was a case called Varley versus Varley.

THE COURT: I remember that and I don't think that I pointed to anyone but that Varley Case is a case that both sides of this lawsuit needs to read because it does address the conduct of the parties and what's to the best interest of the child and I do recall announcing that both of these sides needed to read this Varley Case.

*     *     *

THE WITNESS: You came off the record and made me feel intimidated and threatened before any testimony had been given on my part or Mr. Wilson's part.

THE COURT: I don't feel like I need to respond to that. I certainly couldn't gauge the feelings of any litigant here but the point is that that remark off the record was designed as an aide [sic] to both sides.

THE WITNESS: You also said -- you also said that not only had that happened, had the mother -- had the children been taken away -- you not only said that the children had been taken away from the mother and given to the father but that had happened in that case and it could happen in my case as well.

*     *     *

MR. SANDERSON: That's what I'm talking about but the very first comments that were made about that were made precisely quoting the Varley Case relative to alienation of affection and Your Honor without every [sic] hearing Mrs. Wilson turned around and made a finding that she was guilty of having alienated the affection of this child without ever hearing any testimony from the child, any testimony from Mr. Wilson.

THE COURT: That was pursuant from me hearing testimony, pursuant to the visitation that occurred on August 22nd we did hear proof on that, we heard numerous witnesses.

THE WITNESS: This was on the August 22nd hearing. It was before you ever ordered the child to go to dinner. It was the opening remarks of the August 22nd hearing.

THE COURT: It really doesn't make any difference, I heard the proof and I put down an order.

THE WITNESS: You didn't hear the proof when you made the comment off the record.

THE COURT: That doesn't make any difference, that really doesn't make any difference. I heard the proof and then entered a resulting order.

MR. SANDERSON: Your Honor, I respectfully differ with The Court in this regard, I believe that I'm entitled as an officer of The Court to ask Your Honor why you went off the record, what did you say and why did you say it?

THE COURT: And I'll give you an answer to that. I went off the record to aide [sic] these counsel in the most recent case that I had that involved the visitation and custody problem. I deal with custody problems every day, I have for 16 years, I deal with parents that after hearing the proof it's obvious that one attempts to alienate the child from the other, it seems to be routine unfortunately in cases of divorce and custody measures but that was done primarily to aide [sic] both of the parties and after that we had a rather extensive hearing, I heard numerous witnesses and I entered an order that was signed on September 12th that I felt was fair and equitable to both parties. It set visitation, it kind of drew the rules for the parties to work with and I'm standing by that order.

MR. SANDERSON: Your Honor, I understand and I appreciate that. That order however was entered and those findings were made by The Court after This Court heard testimony from three different young girls and from two, I believe, three of their mothers about the prior conduct of this man with children and you never permitted -- and Mrs. Wilson was never on the stand to testify about what was referred to as butt-facing which was admitted. This conduct was admitted by Mr. Wilson and Your Honor proceeded to make some order of visitation.

THE COURT: I did make a order of visitation because having heard that proof, to me that was not a -- that was pretty much a trivial matter. What you have to do is take the whole thing. Now, I know there's been no appeal of this order.

(2) At the August 22, 1996 hearing Mr. Wilson was on the stand answering questions from his lawyer about an allegation that he had tapped Dr. Oakley's telephone. After explaining that he had installed a recording device a year and a half earlier to record a briefing he received about a job interview, the following exchange took place:

THE COURT: Did you leave it in there to monitor her calls?

THE WITNESS: No, sir, I did not.

THE COURT: Why did you leave it operating after you didn't need it?

THE WITNESS: Because I was -- still belonged to FAPA, and there was no need to unhook it. It was sitting right there on top of the safe, and she has total --

THE COURT: I'm going to say that you not use it again.

THE WITNESS: I won't now.

Q.    (By Mr. Porter) Mr. Wilson, let's be candid with the Court. Did you, in fact, record some phone conversations involving your wife?

A.    Yes, I did.

Q.    Tell me the circumstances about that.

A.    She told me one Saturday afternoon she wanted a divorce because I --

THE COURT: Just a minute. I think I'll invoke his Fifth Amendment here if his lawyer is not going to because he cannot use that evidence.

MR. PORTER: We don't intend to use it. It was nothing -- there's nothing incriminating involved in it.

MS. PALERMO: Wiretapping is -- he's just about to confess to wiretapping. I've got the tape right here of her on the phone with patients and other people.

THE COURT: Whether or not she pursues that at a different level I don't know. I'm just going to tell him I don't need to know that. He cannot introduce this evidence against her in this court. I'm going to enjoin him and restrain him -- either of them from putting any kind of listening device on his phone. It's illegal and don't do it.


**(3)** At the August 22, 1996 hearing Mr. Wilson answered questions about a game he played with the boys called "butt-facing." (Where one participant is held down and another participant pulls down his pants and squats down with his bare bottom on the other's face.) The court interrupted Mr. Wilson's testimony and the following exchange took place:

THE COURT: Did she participate in it?

THE WITNESS: Yes, ma'am. One time she did. There was one time I remember in the living room --

THE COURT: Do you and she still do this?

THE WITNESS: Do I still do it?

- 9 -

THE COURT:  Yeah.

THE WITNESS: Haven't probably in the better part of a year.

THE COURT:  See that you don't because this court finds that conduct very offensive.  It's repulsive, and you could be arrested for it.

THE WITNESS: Yes, ma'am.  Okay.

THE COURT:  The only thing that saves you is -- she's probably not going to admit that she joined in it, but I will not tolerate any conduct like that around any kind of children or adults.  It's sick.

**(4)**  Again, at the August 22, 1996 hearing, the trial judge asked Mr. Wilson's lawyer how Mr. Wilson wished to visit with the child (in light of the fact that they were still living in the same house.)  The record reveals the following:

THE COURT: How does he want to visit this child?  They're in the same house, and I'm going to enjoin them both from interfering with everybody here, but what is his version of visitation?  What does he want to have?  Every other weekend where he's in charge of that child from Friday at 6:00 to Sunday at 6:00 and take them to the movies?  Is that what he wants without her interference?

MR. PORTER:  That's a start, if Your Honor please.

THE COURT: Yeah.  It is.  That's pretty usual.

MR. PORTER: I mean it's somewhat unique when they're in the same house.

THE COURT: I'm sure he's going to be seeing the child during the day.  He can speak to it.  The child should speak to him, and everybody ought to be cordial.

Q.      (By Mr. Porter) What have you -- we haven't talked about that, but what are your feelings and attitude about that?

A.      Well, he is mine, and I love him very dearly.  I would like joint custody of him, but I guess we'll address that at a later time.

THE COURT:  I mean you can ask for full custody of him as far as --

THE WITNESS:  No.

- 10 -

THE COURT:  I haven't got to that part.

THE WITNESS:  I'm not asking for full custody. That's his mother.  He loves her.  I would like joint custody, yes, ma'am, if that's -- I'd like some say-so in what happens to him.

**(5)** Near the end of the August 22, 1996 hearing the trial judge made the following comment:

THE COURT:  I don't want to hear it because we're going to quit at 6:00, but I'm going to order that this child have dinner with this man, and then I'm going to hear all about it tomorrow.  But this is one thing I'm going to do. I'm going to enjoin both of these parties from attempting to alienate the affections from this child.

They're going to continue this, and I'm probably going to have to find that neither one of them are fit custodians.  I don't think that these things that he's done in play are appropriate for a parent to do at all.  I don't think her having this child in her bed and having a loaded gun by the bed is appropriate either.  So they both need to sit back and reassess.  This is not a complicated matter.  Now, you ask him about his mistreatment of these ex-wives.  I'm interested in that.

Dr. Oakley also cites other instances in the hearings of August 22 and August 30 where the trial judge made findings and issued orders adverse to her without hearing any proof from her.  (An order that the child not sleep with her any more; instructing Mr. Wilson how not to answer a question that indicates he thinks he did something wrong; and a finding that "it's obvious that the child is being alienated by the mother.")

A fair trial is the heart of due process.  It, therefore, goes without saying that a trial before a biased or prejudiced fact finder is a denial of due process. *Leighton v. Henderson*, 414 S.W.2d 419 (Tenn. 1967).  But because perception is also important, a party does not have to prove actual bias or prejudice.  A trial judge should grant a motion of recusal where the judge's impartiality might reasonably be questioned.  *Alley v. State*, 882 S.W.2d 810 (Tenn. Crim. App. 1994).  See Rule 10,

- 11 -

Tenn. S. Ct., Canon 3E(1). "[R]ecusal is also warranted when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." *Alley v. State*, 882 S.W.2d at 820.

There are, however, two important limitations on this "objective view" of a judge's conduct. Bias or prejudice in the disqualifying sense must stem from an extrajudicial source and not from what the judge hears or sees during the trial. *Id.* (quoting *State ex rel. Wesolich v. Goeke*, 794 S.W.2d 692 (Mo. App. 1990); *Jack Farenbaugh and Son v. Belmont Const. Inc.*, 194 Ca. App. 3d 1023 (1987)). Otherwise, any judge that makes a ruling adverse to one party would be open to a charge of bias. In addition "impersonal prejudice resulting from the judge's background experience does not warrant disqualification." *Alley v. State*, 882 S.W.2d at 821 (Tenn. Crim. App. 1994). Most trial judges, we suspect, have strong feelings about certain types of behavior or conduct. When the judge perceives that one party or the other has engaged in that conduct, the party should not be surprised that he/she has incurred the judge's wrath.

Viewing all these instances of the trial judge's conduct in the context of this case, we cannot find that the trial judge was required to grant the motion for recusal. There is nothing in the record that indicates the trial judge had a personal bias or prejudice against Dr. Oakley stemming from an extrajudicial source. The trial judge does have, obviously, strong feelings about one parent trying to destroy a child's relationship with the other parent. That allegation had been raised in the hearing of August 22. We consider the exchange that occurred off the record on that date as a warning to both parties that custody of the child might depend on how well the parties behaved as parents; that the judge would not tolerate attempts to poison the child's mind. Although Dr. Oakley says she felt intimidated by the judge's remarks her lawyer

wasn't intimidated. The lawyer filed an affidavit saying she viewed the judge's actions as proper, instructive, and applicable to both parties.

With respect to the wiretapping testimony, the record shows that the trial judge was most critical of Mr. Wilson. She told him not to do it, that any evidence he got that way would be inadmissible, and that it was illegal. We do not draw any inference of bias toward Dr. Oakley from the trial judge's warning to Mr. Wilson not to incriminate himself.

With respect to the other instances cited by Dr. Oakley, we simply view them as examples of how things are likely to go in a trial where all parties tend to be irrational. The trial judge, handling a busy docket, has to set the ground rules and the proof may not always be complete before the ruling. Deciding in advance that the twelve year old male child should not sleep with his mother, that the parties should be prohibited from trying to poison the child's mind, and that the child should be allowed to have dinner alone with his father, does not show a bias toward one party or the other.

One other matter deserves a special mention. That is Dr. Oakley's assertion that the trial judge found on August 22, without hearing from Dr. Oakley, that she was obviously alienating the child. Conceding that it was an error to make that finding of fact without hearing all the proof, the finding was not without some foundation. That allegation was the subject of the hearing, and the trial judge heard proof showing that the twelve year old boy with a great relationship with his father had in the course of a few weeks after the mother filed for divorce, turned into a father-hater. Perhaps the trial judge erred in relying on her instincts, but we do not consider that preliminary conclusion as an example of personal bias and prejudice against the mother.

## III.

## The Marital Property

The trial judge awarded Mr. Wilson one-half of the equity in the home where the parties lived, some jet skis, and other property. The total amounted to 56% of the marital estate -- or 51%, depending on whose tabulation is correct.

Dr. Oakley claims the equity in the marital home as her separate property. Her claim is based on a prenuptial agreement signed by the parties on August 23, 1989, in which they agreed that any property "partially or wholly" owned by either would not be subject to division in the event of divorce.

Such agreements are enforceable if the court finds that they were entered into freely, knowledgeably, and in good faith. *See* Tenn. Code Ann. § 36-3-501. The trial judge held that this agreement was not enforceable.

We will not examine in detail the correctness of the trial judge's holding with respect to the antenuptial agreement because we find it is irrelevant to the issue of the marital home. The proof shows that on August 22, 1989, seven days before the marriage, Dr. Oakley signed a contract to purchase a house on Indian Creek Road and paid $1,000 in earnest money. On August 31, 1989 she received the deed at the closing. Mr. Wilson signed the deed of trust in order to allow the property to be financed, but he did not sign the note.

At the trial the parties stipulated that the house was worth $235,000 and the mortgage was $40,935.39. The court divided the equity evenly after giving Dr. Oakley credit for the $1,000 down payment.

We are satisfied that the equity in the home was marital property and that the antenuptial agreement did not affect it. Marital property includes an increase in value of separate property during the marriage if each party substantially contributed to its preservation and appreciation. Tenn. Code Ann. § 36-4-121(b)(1)(a). Dr. Oakley does not seriously dispute Mr. Wilson's contribution to the preservation and appreciation of the equity in the home. The antenuptial agreement could only operate on the separate property owned at the time of the agreement. At that time Dr. Oakley owned, at most, a $1,000 equity in the house. Even though the agreement refers to property owned "partially or wholly" by the parties, that phrase in an antenuptial agreement cannot overcome the statutory definition of marital property.

Dr. Oakley also asserts that the trial judge erred in awarding both jet skis to Mr. Wilson. She concedes that one jet ski was marital property but insists that the other was her separate property. We think she is correct on this point. Even Mr. Wilson listed one of the jet skis as her separate propery. Therefore, the judgment awarded to Mr. Wilson to accomplish the court's property division should be reduced by $2,000, the value of the jet ski that was Dr. Oakley's separate property.

With respect to the overall division of the marital property, we find that the trial judge acted within her discretion and that the division was equitable.

## IV.

### Custody and Visitation

The final decree awarded custody to Dr. Oakley, but it also contained an order that Mr. Wilson could visit with the child one weekend per month from 6:00 P.M. Friday until 6:00 P.M. Sunday and any other time he was going to be in town if he gave forty-eight hours notice. He could telephone the child twice a week, and the parties would alternate custody on the major holidays. All of the visitation privileges

granted to Mr. Wilson were ordered to be free from supervision, and Dr. Oakley was ordered to encourage the visitation and the relationship between father and son. She was also enjoined from attempting to alienate the child's affections from the father and from interfering with the court ordered visitation.

"A child's interests are well-served by a custody and visitation arrangement that promotes the development of relationships with both the custodial and noncustodial parent." *Pizzillo v. Pizzillo*, 884 S.W.2d 749 at 755 (Tenn. App. 1994). *See* Tenn. Code Ann. § 36-6-301. *See also Rogero v. Pitt*, 759 S.W.2d 109 (Tenn. 1988). Neither party disputes this statement as a guiding principle. Dr. Oakley, however, seeks to overcome this presumption on two grounds. First, she insists that unsupervised visitation with Mr. Wilson poses a danger to the child. She bases this assertion on the admitted episodes of "butt-facing", which she now characterizes as sexual abuse, and on testimony in the record that Mr. Wilson physically abused a former wife; that he fondled two of his stepdaughters during former marriages; and that four years before the divorce he fondled his wife's eleven year old step niece and spied on her as she took a shower.

The court specifically found that Mr. Wilson had not abused the minor child. Although the trial judge found the "butt-facing" to be offensive and ordered it to stop, she found that it was a form of horseplay between Mr. Wilson and his two sons. The child testified that he found it offensive, but he had never complained prior to trial and he also testified that it had not happened in a year or more. The court also found that the charges of sexual abuse concerning the minor girls were unsubstantiated because, even though they allegedly happened from four to ten years earlier, no charges were ever brought against Mr. Wilson, and the proof surfaced only after Mr. Wilson sought an order of visitation with his son. The trial judge's findings with respect to these allegations are presumed to be correct. Rule 13(d), Tenn. R. Civ. Proc. The findings have even greater weight when they are based on the trial judge's

determination of witness credibility. *State ex rel. Balsinger v. Town of Madisonville*, 435 S.W.2d 803 (Tenn. 1968). We cannot find that the evidence preponderates against the trial judge's findings.

In addition, based on the whole record, we do not think any rational trier of fact could conclude that Mr. Wilson poses a threat to this child. In seven years of the marriage, from the time the child was five, through times when father and son were alone for considerable periods, there is not a whisper of anything improper in their relationship except for the "butt-facing" incidents. To the contrary, all the proof suggests a close, loving relationship, that ended when Dr. Oakley sought a divorce. This record simply does not support a finding that unsupervised visitation with Mr. Wilson puts the child in danger.

The second reason Dr. Oakley advances for opposing Mr. Wilson's visitation rights is simply that the child is against it. We would have to concede that the child is now alienated from his father. But allowing minor children to dictate a parents' visitation rights is a strange concept. As Mr. Wilson points out, if the issue was custody and not just visitation, the child's state of mind would be only one factor the courts should consider. Tenn. Code Ann. § 36-6-106. It simply cannot be the only factor to consider in deciding visitation privileges. So, we reject this reason for reversing the visitation order.

Enforcing the order is another matter. Dr. Oakley argues that the injunctions ordering her to promote the relationship between father and son and ordering her to refrain from interfering with the visitation are at odds with this court's decision in *Jones v. Jones*, No. 01A01-9607-CV-00346, filed in Nashville Feb. 26, 1997. We are aware that some courts are reading *Jones* as a prohibition of a court ordered visit with a non-custodial parent against the child's wishes. In our view, that is an erroneous interpretation of the *Jones* decision. But a fuller analysis of *Jones*

must await another day, because the court's order in this case is not the same type of order *Jones* dealt with. In *Jones* the court ordered the custodial parent to coerce the children into having a "meaningful" visit with the non-custodial parent, even to the point of filing an unruly child petition in juvenile court if the child resisted. The critical paragraph in the opinion states as follows:

> The trial court went too far when it ordered the children to have "meaningful visitation" and when it required the parents to coerce the children to comply with the visitation schedule. Accordingly, we modify the trial court's visitation and custody decrees by deleting both the requirement that visitation be "meaningful" and the parents' obligation to commence unruly child proceedings if the children do not cooperate with visitation. Since the parties' oldest child has now reached the age of majority, the parties' only remaining obligations are to refrain from disparaging each other in the presence of their children and to cooperate with their respective efforts to have visitation in the manner prescribed by the trial court. The parents should not be required to force their children to engage in visitation against their wishes.

*Jones v. Jones*, slip op. 4.

The injunctions in this case do not go that far. They are in fact more like the remaining orders in *Jones* after we reversed the more radical part.

We recognize that a court has a near-impossible job trying to mend broken relationships. But if we believe the child's relationship to both parents is important, we think the trial courts have the authority to order a custodial parent to promote the relationship with the other parent and to refrain from interfering with the non-custodial parent's visitation privileges. As we read the record, that is what the trial judge did in this case.

## V.

## The Constitutionality of the Injunctions

Dr. Oakley challenges the injunctions entered in this case because (1) they are beyond the scope of the pleadings; (2) they are unconstitutionally vague; (3) there is no evidence that any state of affection existed between the child and Mr. Wilson when the injunctions were issued; and (4) Rule 65.07, Tenn. R. Civ. Proc. is unconstitutional because it fails to provide minimum due process guarantees.

We will deal with the last first. After laying down rules about restraining orders and temporary injunctions and providing certain procedural safeguards, Rule 65, Tenn. R. Civ. Proc. then provides that the procedural safeguards may be ignored in domestic relations cases if the trial court deems it just and proper to do so. Rule 65.07, Tenn. R. Civ. Proc. Dr. Oakley contends that allowing a trial court to interfere with vested rights without providing a litigant in a domestic relations case any notice of the proposed action violates the fundamental rights protected by due process.

The state attorney general appeared and moved to dismiss this challenge to Rule 65.07. The state's position is that the rule, having been promulgated by the Supreme Court, can only be challenged by a petition in the Supreme Court. This is the result reached in *Barger v. Brock*, 535 S.W.2d 337 (Tenn. 1976), in which a group of attorneys challenged, on constitutional grounds, a Supreme Court rule that imposed an annual fee on lawyers. The Supreme Court said:

> We hold that the inferior courts of the state may not entertain any suit or action challenging the validity of any Rule of this Court. Such a suit would be in the nature of a bill of review or to impeach a judgment of this Court ...

535 S.W.2d at 342. Quoting a Florida decision, the Court said that until the rules are changed by the source of authority, they remain inviolate. The proper way to challenge the rule is by a petition to the Supreme Court.

We are of the opinion that we are bound by the *Barger* decision to dismiss this challenge to Rule 65.07. Until the rule is changed by the Supreme Court, we must presume that it is valid.

If the rule is valid, there can be no objection that the injunction exceeded the scope of the pleadings or that there was no proof that the child had any affection for Mr. Wilson. We think that at a preliminary stage of a domestic relations case, where the trial court learns (by pleadings or by statements in open court) that a controversy has arisen over one parent's attempt to alienate the child from the other parent, the trial judge may enjoin the parties not to engage in such offensive conduct. Rule 65.07 provides the trial judge with that flexibility.

As to the vagueness charge, Dr. Oakley says that the order prohibiting her from "attempting to alienate the affections of this child to the father in any manner whatsoever" lacks sufficient detail to convey what the court expects of her. *See Jones v. Jones*, No. 01A01-9607-CV-00346 (filed at Nashville Feb. 26, 1997). We think, however, the injunction is sufficiently clear to provide a reasonable guide for a parent's personal conduct.

## VI.

Dr. Oakley asserts that the trial court erred in awarding $15,000 to Mr. Wilson to help pay his attorney's fees. First, she attacks the form of the award, specifically the fact that the final decree awards Mr. Wilson's attorney a judgment against Dr. Oakley. In this contention, we think Dr. Oakley is correct. The attorney is not a party to this action, so any award should run to Mr. Wilson and not his attorney. The lower court's judgment should be modified to that extent.

As to the merits of the award, however, we think the trial judge acted within her discretion. *See Luna v. Luna*, 718 S.W.2d 673 (Tenn. App. 1986). Even where one spouse receives substantial assets in the property division, the court may award an attorney's fee to allow that spouse to preserve those assets. *Lancaster v. Lancaster*, 671 S.W.2d 501 (Tenn. App. 1984).

- 20 -

Mr. Wilson asks the court to award him an additional amount to cover his legal expenses on appeal. Dr. Oakley seeks the same from Mr. Wilson. We are satisfied, however, that both applications should be denied. Mr. Wilson asserts that this is a frivolous appeal as described in Tenn. Code Ann. § 27-1-122. We disagree.

The judgment of the court below is modified to give Dr. Oakley a $2,000 credit for the jet ski awarded to Mr. Wilson that both parties recognized as Dr. Oakley's separate property. In addition the judgment for the $15,000 in attorney's fees should run in favor of Mr. Wilson and not his attorney. In all other respects the judgment is affirmed and the cause is remanded to the Circuit Court of Davidson County for further proceedings. Tax the costs on appeal to Dr. Oakley.

_____
BEN H. CANTRELL, JUDGE

CONCUR:


_____
HENRY F. TODD, PRESIDING JUDGE
MIDDLE SECTION


_____
WILLIAM B. CAIN, JUDGE