IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE

## D. A. PRICE  v. P. C. PRICE

**Direct Appeal from the Circuit Court for Blount County**
**No. E-17212     Hon. W. Dale Young, Judge**

---

**No. E1999-00102-COA-R10-CV - Decided May 31, 2000**

---

This is an appeal of the Trial Court's Order changing physical custody of the parties' two children to the Mother, ostensibly because the Father, who had shared joint physical custody since the divorce, moved from Maryville to Knoxville. The Mother was granted a temporary injunction awarding her temporary physical custody pending final adjudication of her petition for permanent change of custody. The Trial Court scheduled a hearing solely on the issue of whether the injunction awarding Mother temporary custody should remain in force until the trial on the change of custody. The Trial Court, based on limited proof received at the injunction hearing, permanently changed custody from joint to Mother. Because the Trial Court made no finding of irreparable harm to support continuing the temporary injunction, and because the record does not support such a finding, we vacate the injunction and reinstate the original joint custody award pending further action by the Trial Court. It is apparent from the record before us that both parties and the Trial Court at the hearing resulting in the order appealed from proceeded solely on the issue of whether or not the temporary injunction should remain in force until the hearing on the change of custody. As a result, neither party had an opportunity fully to present her or his evidence on the change of custody issue. We hold that the Trial Court erred in changing custody without allowing the parties a full hearing on that issue. Therefore, we reverse the judgment of the Trial Court, reinstate the original custody arrangement, and remand the case for a trial on the requested change of custody.

**Tenn. R. App. 3; Judgment of the Trial Court Reversed and case Remanded to the Trial Court.**

SWINEY, J., delivered the opinion of the court, in which FRANKS, J., and SUSANO, J., joined.

Scarlett A. Beaty, Knoxville, for the Appellant, D. A. Price.

Carl P. McDonald, Maryville, for the Appellee, P. C. Price.

## OPINION

## Background

D. A. Price ("Father") and P. C. Price ("Mother") divorced on November 22, 1996. They agreed that legal and physical custody of the two minor children of the marriage would be vested in the parties jointly, and the Trial Court so ordered. For the next two and one-half years, the children, now 15 and 12 years old[1], divided their time equally between the homes of their parents, who lived "about two minutes away from each other" in Maryville, Tennessee. In accordance with their agreement, neither party paid child support to the other.

On July 22, 1999, Mother filed a Motion asking the Trial Court to change physical and legal custody of the children to her, set visitation for Father, and establish child support obligations. For grounds, Mother alleged in her Motion, among other reasons, that Father was planning to move voluntarily from Maryville to Knoxville, Tennessee the next day, July 23, 1999. In her Motion, Mother also asked the Court to order that during the children's visitation, the Father "be the only non-family member spending the night in his apartment in Knoxville, unless he is married to any such person." She also asked that a temporary injunction be entered pursuant to Tenn. R. Civ. P. 65.07, changing legal and physical custody of the children to her, pending further order of the Court, and allowing Father visitation every other weekend. Mother complained in her pleadings that Father is homosexual and has gay friends with whom he has allowed the children to associate. The Trial Court entered an *ex parte* injunction on the day the Mother filed her Motion, giving her sole temporary physical custody of the children pending a full hearing.

Father filed an Answer and Counter-Petition on August 2, 1999, alleging that "there is absolutely no meaningful difference in the Father's former or current living arrangement and his ability to provide for the children and to meet their needs." He further alleged that Mother had taken the children to see Dr. Thomas Hanaway, a clinical psychologist, who concluded that the children are well adjusted, well cared for and that "they need both parents equally in their lives." Father alleged a change in circumstances consisting of the Mother's attempts to alienate the children from their Father and to interfere with the exercise of his custodial rights, and he asked the Court to grant him sole legal and physical custody of the children.

A hearing was held by the Trial Court on August 23 and 24, 1999. At the beginning of that hearing, counsel for Mother announced to the Trial Court:

> So, what we're here on today is whether or not this TRO shall
> continue, because your Honor may want to give us some suggestions
> as to what parameters you may want us to deal with with regard to
> that.

---

[1]Father testified that "Seth was born August 7th, 1984 at 11:43 p.m." and that Sara was born "May 6th, 1988 about 8:18 a.m."

Counsel for Father replied:

> I think he summed up what I perceive the reason we're here today, which is for you, Your Honor, to determine whether or not the injunction that he obtained *ex parte*, obviously with you having limited information of the facts, should continue in effect or whether the Order that these people have had for the last three years is sufficient to hold everybody in place until we can get a final trial date.

The Trial Court inquired:

> When have you all agreed to a date to hear the issue of whether or not the custody arrangement will be changed?

Counsel for Father replied:

> We haven't set the trial date yet, Your Honor . . . .

The Trial Court told counsel that he had scheduled only one hour to hear the matter, and stated the issue:

> Let's all understand that the issue before us today is that whether or not the Petitioner can show to the Court by the greater weight of the evidence that irreparable harm will be committed as to these children unless the TRO is extended. Good custody, bad custody, change of custody, leave it alone is not an issue today, and so we won't be trying those matters. We'll just be determining whether or not the greater weight of the evidence shows that irreparable harm will result to these children.

There is no doubt that all participants in that hearing believed and proceeded as if the hearing was solely to determine whether or not the injunction would remain in effect until a later hearing was held on the requested change of custody. As stated by the Trial Court, the change of custody issue was not to be tried at that hearing as the sole purpose of that hearing was to determine whether or not irreparable harm would result to the children unless the temporary injunction was extended to the time of trial.

Counsel for Mother called Father and questioned him as an adverse witness. Father testified that he taught school for 19 years and, after leaving that career, has been a self-employed realtor for three years. He testified that he is involved in a homosexual relationship and that he has moved from Maryville to a condominium in Knoxville partly because his partner lives in that complex, in a different condominium. Father also testified that it was a twenty minute drive from

-3-

his condominium in Knoxville to Maryville High School and a twenty two minute drive to Maryville Middle School. Father also agreed that the children would remain in the Maryville School system and that it was his intention that the children would continue to participate in all their activities in Maryville as before. Another reason for the move is that his children benefit from shopping in Knoxville, swimming and playing tennis at his condominium complex, going to movies, concerts and plays, and visiting friends who live in Knoxville. He testified that his children have lived in Maryville and have attended Maryville schools all of their lives, and that the children wanted him to move to Knoxville so that they could enjoy the benefits of Knoxville. He told his children that at some time in the future, he may buy or build a house to live in with his partner, but testified that he has no present plans to do so. He also testified, "I have no intentions of every having a live-in while I have my children." He testified that Mother was upset because their son made the guest list for his birthday dinner with his Father and, as a result, some of the people who attended the birthday dinner at a Knoxville restaurant were gay friends of the Father. Father's counsel questioned him on cross-examination:

> Q: Why are you opposing your ex-wife's attempt to change the custody situation, Mr. Price?
>
> A: Because the children - -
>
> THE COURT: That's not a question for today.
>
> MS. BEATY: Okay.
>
> THE COURT: The question today is what irreparable harm, if any, will these children suffer if this temporary restraining order is or is not effectuated. We'll get to the custody matter one of these days.

Father testified that Mother had complained to him about his spending money on the children that she could not afford to do. He also testified that it was the Mother, and not he, who discussed his sexual orientation with people in the community, thereby potentially causing the children to be subjected to ridicule or stress. He stated that he "was not going to lie about it," but that Mother insisted he be more "discreet." He also testified that, since early in their marriage, he has been confronted on numerous occasions by numerous people about the sexual preference of Mother.

William Tillery, Licensed Clinical Social Worker, testified for Mother that his background and training deal with the person in the context of family and society, as compared with clinical psychology, which deals more with the individual. He currently is counseling five individuals who are "living a homosexual lifestyle." Over Father's continuing objection, he testified that "Blount County is a small, southern type atmosphere that is basically very conservative . . . and so homosexuality in this type of atmosphere is treated with disrespect, with scorn, as though there is something wrong with people who are homosexuals." Counsel for Mother attempted to ask Tillery "about areas concerning joint custody and what harm, if any, there may be with regard to

-4-

what the situation was before, irreparable harm to the children . . ." The Court instructed:

> What we're here for today is for the Court to make a determination of whether or not there is irreparable harm if the temporary restraining order is not extended. It's that temporary restraining order that keeps Mr. Price from having joint custody of these children in Knox County on the basis that the parents have agreed on a temporary basis. So I need to find out from every witness who comes to this courtroom today what his or her opinion is about whether or not there are facts and circumstances that would cause these children irreparable harm. So that's what we really need to get down to, and that's where you need to focus your attention, and that's where you need to focus my attention.

So instructed, Tillery responded that joint custody arrangements in general are very difficult for children, since "they don't have a place to hang their hat." He opined that in this particular case:

> . . . you have a tortured father because he couldn't live his gay lifestyle. He had something that was hurting on the inside that he needed to take care of. So he comes out, and so they divorce as gentlemanly as possible. . . . These problems became greater when the father decided to move out of the community primarily for the proposes of, appeared anyway from what I've read in the transcripts and interviews, where he might feel more comfortable or more accepted in his gay lifestyle. So now we have a conservative Maryville family and we have the liberated gay lifestyle in another community. And to me, the homosexual issue is not of primary concern. It's the tremendous difference in the attitudes, beliefs, rearing practices and parenting skills of both of these parents. To switch children back and forth every two to three days with this measure of difference between parents, I think is just asking for irreparable harm.

Mr. Tillery testified that joint custody of these children was not reasonable, workable, practical or in the best interest of the children. He is generally opposed to joint custody on the basis that it creates problems for the children. He is aware that these particular parents agreed to joint custody three years ago when they divorced, and he thinks that was a mistake. He testified that having the children change environments every few days from Maryville to Knoxville, with the change in lifestyle between Mother's and Father's environments, "just adds more fuel to the fire to create problems." He had a concern, "since I have children who commuted to the University of Tennessee, who were older than these kids, and it terrified me - - Alcoa Highway is one of the worst

and most dangerous highways . . . ."[2]  Mr. Tillery also testified that Maryville, as compared with Knoxville, presents very little opportunity for secrecy about one's lifestyle:

> Secrecy is probably the biggest destroyer in families and in mental health.  And in Blount County, to its credit or discredit, and Maryville, people kind of watch what you do and are a little bit nosey and critical, and so if children are different, or having a different kind of family, that exposes them to criticism by their peers and other people in the community.  In Knoxville, they probably would not get that much criticism except under very specific circumstances.

Mr. Tillery also opined that "homosexuality is probably developed out of a lot of different areas and learning is one," therefore continuing with joint custody of the children posed the possibility of irreparable harm to the children. He opined that the children would be harmed by continuing joint custody and that they should stay in Maryville.  Incredibly, despite his specific opinions about the welfare of these children, he testified that he had never seen or talked to either one of them, or to the Father.

Mother testified that she is a registered nurse and has worked at Blount Memorial Hospital for nearly 20 years.  The children were born in Blount County and have lived there all of their lives.  Her son is a member of a church in Blount County, and all of the children's doctors and dentists have their offices in Blount County.  All of the children's friends live in Blount County. The children's paternal grandparents live less than one mile from her house, and they have been involved in the care of the children on a daily basis.  The children have bedrooms at their grandparents' home.  Father lived less than a mile from Mother's house before he moved to Knoxville. Mother's home is two miles from her daughter's school and three miles from her son's school.  When asked what has happened since the divorce of 1996 which caused her to contend that irreparable harm will occur to her children if the joint custody arrangement is reinstated and the injunction dissolved, she replied:

> I'm very fearful because, number one, the move.  Here he's taking two children that have been raised in this community and taking them to a community that they are not familiar with.  They have no friends that they have formed relationships with as they have here. . . . I'm worried about their isolation over there.  I think that they need to be in their own community where their school activities are, where their church is.  I think that they need to be around the support that they have here, such as their grandparents and myself. We have all been a part of their lives and that would be a big problem as far as that is concerned, as far as the move is concerned.

---

[2]The Trial Court took judicial notice that Alcoa Highway is "a scary place."

Mother further testified that she no longer trusts Father, and the joint custody arrangement no longer works, ". . . just the sheer fact of trying to move the children back and forth to their activities and forgetting things, and their lives not being – being chaotic as it is." She also complained that the children "can't tell their friends about what's going on, and they're in conflict about that," and that Father had bought the children expensive gifts and given them an allowance of $200 a month. The Trial Court then reminded Mother to testify about "whether or not the children will suffer irreparable harm."

Mother testified that Father has become progressively open about "his homosexual lifestyle" since the divorce. The children don't want to tell her things, are more isolated and secretive. She testified that, prior to the divorce, Father had "made a verbal commitment. . . that he would not expose the children to his lifestyle. . . that he wouldn't have them around his friends . . . that he couldn't see ever in his life that he would be with someone, that his children were his primary focus in his life . . . . and that's why I agreed to joint custody." She stated that in the month she has had sole physical custody since the granting of the temporary Order, the children have adjusted to the change, although they were upset when she first obtained the Order. In her opinion, there would be irreparable harm if the children return to the joint custody arrangement. She also thought that "certain things can be learned" and that the children are exposed to certain things in the Knoxville lifestyle with which she has a problem. On cross-examination, she stated that she told the children she would seek sole custody if their Father did not stop taking them to social events with his gay friends. She also acknowledged having told her son that if he and Father saw each other more often than the temporary Order called for, Father would be "in contempt of court."

After Mother's proof, counsel for Father announced that Father would not call any witnesses except Seth, the parties' 14-year old son. The Trial Court stated:

> I respectfully decline to do that at this stage of the hearing. That may be most appropriate when the Court considers whether or not the joint custody arrangement will be changed, but insofar as making a decision about whether or not irreparable harm has occurred or will occur, I respectfully decline to interview the child along those lines.

Father introduced the deposition of Dr. Thomas P. Hanaway, Clinical Psychologist, as well as a large number of professional journal articles supplied by Dr. Hanaway. Mother was cross-examined to elicit the fact that she had consulted Dr. Hanaway for an evaluation of the children to determine whether their Father's sexual orientation and the joint custody situation was causing emotional harm to the children. Dr. Hanaway had interviewed the children and done some testing, and had told the Mother that the children were well-adjusted. Mother had not advised the Trial Court of this evaluation because she did not agree with Dr. Hanaway's findings and opinion.

The Trial Court instructed the attorneys to prepare Memoranda of Law and to submit "proposed findings of fact and conclusions of the law for the Court to consider in making this decision as to this temporary restraining order issue only." The Court then continued the temporary custody Order in favor of Mother until September 3, 1999, the deadline for submission of the

requested documents.

On September 30, 1999, the Trial Court filed a Memorandum stating that he had "carefully reviewed the Proposed Findings of Fact and Conclusions of Law, together with very thorough Briefs, submitted by Counsel for the parties." In that Memorandum, the Trial Court made no finding with regard to the sole issue about which the Court had narrowed the hearing, i.e., "the greater weight of the evidence that irreparable harm will be committed as to these children unless the TRO is extended." The Trial Court instead found that the joint custody arrangement between the parties has worked very well except for the Father's move to Knox County, which would prohibit these minor children from maintaining "a haven in all of the storms of life" in the place where they have grown up all of their young lives. The Trial Court concluded that the sole issue before it was "to make a decision that will serve the children's best interest. The parents' wants, wishes and desires are not the criteria; the sole criteria is the best interest of the children." The Trial Court then found that it is to the manifest best interest of the children that their parents continue to enjoy joint legal custody and that the Mother of the children be designated the physical custodial parent. Father was granted standard visitation and, in addition, "such additional visitation as may be reasonable and as may be agreed upon between the parties."

On October 21, 1999, the Trial Court filed an Order which provides, in part:

1. Patricia is hereby designated the physical custodian of the minor children of this marriage, Seth and Sara.

2. Dwight A. Price ("Dwight") is hereby granted visitation pursuant to the standing orders of this Court, and in addition, such additional visitation as may be reasonable and agreeable between Patricia and Dwight.

3. All other joint custodial responsibilities shall remain with both Patricia and Dwight.

4. By agreement of the parties, Dwight shall pay child support to Patricia in the agreed amount of $1,805.00 per month as of September 30, 1999, which amount is agreed to by the parties in compliance with the Child Support Guidelines, and shall be responsible for an amount equal to the amount necessary for Patricia to obtain health insurance for the children with her employer, Blount Memorial Hospital, Incorporated.

On November 16, 1999, counsel for Father filed a Motion in the Trial Court which alleged:

> [Father] moves this Honorable Court to set a trial date in this matter and as grounds herefor would show that counsel for the parties have been unable to agree to set a trial date due to disagreement and/or confusion as to whether the Order previously entered herein is a temporary or final Order. Accordingly, the Respondent asks that this Court immediately set this matter for trial if said Order is a temporary Order and if it is not a temporary Order, then Respondent would ask

that the clerk be directed to forthwith compile and transmit the record in appeal pursuant to the Tennessee Rules of Appellate Procedure.

On that same day, counsel for Mother filed a Motion for Pretrial Conference and Entry of Pretrial Order which alleged:

This Court has heard evidence in this matter in August, 1999, and it appears there may be additional evidence should this Court conclude that the Order of October 20, 1999, is not a final order. Conducting a pretrial conference will allow for expediting the disposition of the case and encourage more thorough trial preparations.

The Trial Court responded on November 19, 1999, by filing an Order as follows:

. . . the Court advised that it was its intent that the October 20, 1999, Order be a final order disposing of all issues before the Court at that time. Accordingly, it is ORDERED as follows: (1) The motion to set a trial date be and the same is hereby overruled. (2) The motion for a pretrial conference be and the same is hereby overruled. (3) The motion for attorney fees is held in abeyance and is not affected by the Order of October 20, 1999, or this Order.

## Discussion

Father appeals to this Court and raises the following issues, which we quote:

I.      Whether the Trial Court erred in changing custody of the parties' minor children from shared joint physical custody by both parties to sole physical custody of the Mother at the conclusion of what was stated to be a hearing on the sole issue of whether there was "irreparable harm," sufficient to warrant the extension of an *ex parte* injunction pending a full hearing on the merits.

I(b).   Further, the Court erred in not finding that the Mother had failed to meet her burden of irreparable harm sufficient to justify the continuation of the injunction.

II.     The Trial Court erred in permitting the Mother to testify to alleged "promises" made by the Father before the divorce which were not reflected in the parties' Marital Dissolution Agreement.

Mother raises two issues in this appeal:

I.      The Trial Court erred when it did not require that, during visitation

-9-

with Dwight, there be no overnight guests with whom Dwight has a sexual relationship or involvement, and that he be required to visit with his children unaccompanied by his alternate lifestyle friends, especially his "boyfriend."

II. This Court should award attorney's fees in favor of Appellee, Patricia Price, in connection with this appeal and remand the fixing of those fees to the Trial Court for determination of the appropriate amount to be awarded.

Our review is *de novo* upon the record, accompanied by a presumption of the correctness of the findings of fact of the Trial Court, unless the preponderance of the evidence is otherwise. Rule 13(d), T.R.A.P.; *Davis v. Inman,* 974 S.W.2d 689, 692 (Tenn. 1998). The Trial Court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *Ganzevoort v. Russell,* 949 S.W.2d 293 (Tenn. 1997).

Mother obtained temporary physical custody of the children when the Trial Court granted her request for temporary injunction filed pursuant to Rule 65 of the Tennessee Rules of Civil Procedure. That rule provides that temporary injunctions may be granted during the pendency of an action:

> if it is clearly shown by verified complaint, affidavit or other evidence that the movant's rights are being or will be violated by an adverse party and the movant will suffer immediate and irreparable injury, loss or damage pending a final judgment in the action, or that the acts or omissions of the adverse party will tend to render such final judgment ineffectual.

Mother specifically sought the application of Tenn. R. Civ. P. 65.07, which provides:

> In domestic relations cases, restraining orders or injunctions may be issued upon such terms and conditions and remain in force for such time as shall seem just and proper to the judge to whom application therefor is made, and the provisions of [Rule 65] shall be followed only insofar as deemed appropriate by such judge.

This Court has interpreted the above-quoted language in Rule 65.07 as permitting wide discretion by a Trial Court when issuing temporary restraining orders in domestic relations cases. In *Wilson v. Wilson,* 987 S.W.2d 555 (Tenn. Ct. App. 1998), we observed:

> After laying down rules about restraining orders and temporary injunctions and providing certain procedural safeguards, Rule 65, Tenn. R. Civ. Proc. then provides that the procedural safeguards may be ignored in domestic relations cases if the trial court deems it just

-10-

and proper to do so.  Rule 65.07, Tenn. R. Civ. Proc.

*Wilson v. Wilson,* 987 S.W.2d 555, 565 (Tenn. Ct. App. 1998).  Owing to the Trial Court's wide latitude in custody cases under 65.07, as construed by this Court in *Wilson, supra,* we decline to revisit the original granting of the temporary injunction.  However, the Trial Court then conducted a hearing to determine whether the temporary injunction should be continued.  The Trial Court directed that the injunction would be continued only if Mother showed that irreparable harm would occur if the injunction were vacated.  The parties presented such proof as the Trial Court would allow under time constraints and the Trial Court's limiting instructions.  The Trial Court made no finding that irreparable harm would occur if the injunction were not continued.  Moreover, the Trial Court found that "the joint custody arrangement between the parties has worked very well except for the Father's move to Knox County, which would prohibit these minor children from maintaining 'a haven in all of the storms of life' in the place where they have grown up all of their young lives." From the record before us, we hold that Mother has failed to show that Father's move to Knox County would result in "irreparable harm" required to support a continuation of the temporary injunction. Accordingly, we vacate that injunction and reinstate the original custody award to the parents jointly pending further action by the Trial Court as directed below.

Next we address the Trial Court's Order which permanently changed physical custody of the children to Mother.  We presume the original award of joint physical and legal custody of the children was made in accordance with the standard set out in T.C.A. § 36-6-101(a)(2), which provides, in part:

> Unless the court finds by clear and convincing evidence to the contrary, there is a presumption that joint custody is in the best interest of a minor child where the parents have agreed to joint custody or so agree in open court at a hearing for the purpose of determining the custody of the minor child.

That statute also provides that "[t]he burden of proof necessary to modify an order of joint custody at a subsequent proceeding shall be by a preponderance of the evidence." T.C.A. § 36-6-101(a)(2). An award of custody cannot be changed in the absence of a showing of new facts or "changed circumstances" justifying an alteration of the original custody award. *Musselman v. Acuff,* 826 S.W.2d 920, 924 (Tenn. Ct. App. 1991).  Accordingly, the Trial Court was required to determine whether the preponderance of the evidence showed that changed circumstances required a change from joint custody to the sole custody of their Mother.

If this case were in the customary appellate posture in which counsel for the parties have brought all of their competent witnesses and admissible evidence before the Trial Court and the Trial Court has made a factual determination about where the preponderance of the evidence of changed circumstances lies, we would be able to review that determination *de novo* with a presumption of correctness, as it is our duty to do under T. R. A. P. 13(d).  However, we are unable to perform any meaningful appellate review of the facts in this case because the parties were

-11-

repeatedly admonished by the Trial Court to present only evidence tending to show whether the temporary injunction should be continued in force. We restate for emphasis the Court's instructions:

> Let's all understand that the issue before us today is that whether or not the Petitioner can show to the Court by the greater weight of the evidence that irreparable harm will be committed as to these children unless the TRO is extended. Good custody, bad custody, change of custody, leave it alone is not an issue today, and so we won't be trying those matters. We'll just be determining whether or not the greater weight of the evidence shows that irreparable harm will result to these children.

* * *

> Q:     Why are you opposing your ex-wife's attempt to change the custody situation, Mr. Price?
>
> A:     Because the children - -
>
> THE COURT: That's not a question for today.
>
> MS. BEATY: Okay.
>
> THE COURT: The question today is what irreparable harm, if any, will these children suffer if this temporary restraining order is or is not effectuated. We'll get to the custody matter one of these days.

* * *

> What we're here for today is for the Court to make a determination of whether or not there is irreparable harm if the temporary restraining order is not extended. It's that temporary restraining order that keeps Mr. Price from having joint custody of these children in Knox County on the basis that the parents have agreed on a temporary basis. So I need to find out from every witness who comes to this courtroom today what his or her opinion is about whether or not there are facts and circumstances that would cause these children irreparable harm. So that's what we really need to get down to, and that's where you need to focus your attention, and that's where you need to focus my attention.

* * *

After Mother's proof, counsel for Father announced that Father would not call any

-12-

witnesses except Seth, the parties' 14-year old son. The Trial Court stated:

> I respectfully decline to do that at this stage of the hearing. That may
> be most appropriate when the Court considers whether or not the joint
> custody arrangement will be changed, but insofar as making a
> decision about whether or not irreparable harm has occurred or will
> occur, I respectfully decline to interview the child along those lines.

The Trial Court instructed the attorneys to prepare Memoranda of Law and to submit "proposed findings of fact and conclusions of the law for the Court to consider in making this decision as to this temporary restraining order issue only."

Neither party was allowed to litigate the issue of whether changed circumstances required a change of custody. The Trial Court permitted only testimony which it deemed relevant on the issue of whether the temporary injunction should be continued. Offers of proof on the issue of changed circumstances were rebuffed by the Trial Court with the admonition that only the issue of "irreparable harm" was before the Court. Under these peculiar circumstances, it would be improper for this Court to offer even conjecture about what the preponderance of the evidence, if fully developed, might show on the issue of changed circumstances. Clearly, neither of these parents has had her or his day in court. Even after the entry of the Trial Court's final judgment, counsel for *both* parties filed motions asking for a trial date or a pre-trial conference. The Trial Court responded that " the October 20, 1999, Order [is] a final order disposing of all issues before the Court at that time." For the reasons herein stated, we respectfully disagree. There is no dispute placed before the Courts of this State more important than the custody of children after a divorce. Such a determination requires a full, fair, and complete hearing. The parties in this case have not received such a hearing, and therefore, we remand the case for trial on that issue.

## CONCLUSION

The judgment of the Trial Court is reversed and this cause remanded to the Trial Court for trial on the issue of whether changed circumstances require the physical custody of the parties' children to be changed. Pending such trial, physical custody of the children shall be as originally ordered in the divorce decree, joint physical and legal custody. The costs of this appeal are assessed against the parties evenly.