IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 5, 2001 Session

## THOMAS N. ROACHE v. JUSTINE BOURISAW

**Appeal from the Chancery Court for Montgomery County**
**No. 90-65-0284    Carol Catalano, Chancellor**

_____

**No. M2000-02651-COA-R3-CV - Filed October 10, 2001**

_____

This case involves a non-custodial parent's petition for change of custody. The original marital dissolution agreement granted the mother full custody of the child and the father alternate weekends and holidays and two weeks each summer. The mother later moved to Missouri, and the parties adjusted visitation accordingly. Later, the father filed and was granted a contempt motion due to the mother's failure to allow him to see the child. He subsequently filed a motion for change of custody which was also granted. The court found that the circumstances warranted the change of custody. The mother appeals. We affirm the trial court's change of custody.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and WILLIAM B. CAIN, J., joined.

Gregory D. Smith, Clarksville, Tennessee, attorney for the appellant, Mary Justine Bourisaw.

Carrie W. Kersh, Clarksville, Tennessee, attorney for the appellee, Thomas Neal Roache.

### OPINION

Thomas Roache ("Father") and Mary Justine Roache-Bourisaw ("Mother") were divorced and a final decree and Marital Dissolution Agreement (MDA) entered November 24, 1992. During the marriage, the parties had one child, a son born March 16, 1988. The MDA provided in relevant part:[1]

> 1. [Mother] shall retain exclusive care, custody and control of the said minor child
> . . .The [Father] shall have the right to visit with said child at reasonable times and
> reasonable places. The [Father] shall have the following specific visitation:

_____

[1]The paragraphs are numbered consecutively for purposes of convenience.

A. every other weekend from 5:00 p.m. Friday until 5:00 p.m. Sunday on alternate weekends;

B. two (2) weeks in the summer;

C. the parties shall alternate the following holidays;

    a) Christmas Eve

    b) Christmas Day

    c) New Year's Day

    d) Memorial Day

    e) Easter

    f) Fourth of July

    g) Labor Day

    h) Halloween

    i) Thanksgiving

2. The [Father] shall have the right to reasonably consult with school officials concerning the child's welfare, educational status and progress, including access to pupil records.

3. The [Father] shall participate in the following decisions and these areas of custody shall be shared: sports, school, church and medical.

4. The [Father] and child shall have communications with each other by telephone and shall not be interfered with by the [Mother].

5. Both parties will keep the other party informed of his or her address at all times and when the child are [sic] with that party the child shall keep the other party informed of the address and the telephone number.

6. The parties shall make every reasonable effort to provide access to the other parent and to support the child's feeling of love for the other parent.

7. Neither party shall in any way attempt to harm, hinder, decrease or destroy the natural love the child [has] for the other parent. Neither parent shall speak badly of the other parent to the child.

8. Should either party move more than 75 miles from the current address, the above visitation schedule will be reallocated so the [Father] shall have visitation equivalent day-per-day as now enjoyed, but arranged to or appropriately comply with the parties' schedules, circumstances and the child's best interest.

Mother had two other children from a prior marriage whom Father treated as his own during the parties' marriage. No issues regarding these other two children were included in the divorce decree or marital dissolution agreement. However, in the fall of 1997, Father obtained custody of the oldest daughter, Mary, due to physical abuse by Mother's new husband in 1995 and 1996.[2]

Father testified that since obtaining custody of Mary, he has had a difficult time keeping in contact with his son. He has to have Mary call to talk to her brother and then let Father speak with

_____

[2]There was testimony that one of the incidents between Mary and her step-father was due in part to Mary's drug use which led to her placement in rehabilitation.

the child. Otherwise, Mother tells him the child is not there or outside playing. On January 20, 1998, Father filed a motion for contempt stating that visitation with his son has been difficult since he has sought & received custody of Mother's oldest daughter, and more specifically, he was denied visitation for Christmas of 1997. Father did visit with his son during the summer of 1997, along with the child's half brother.

On November 10, 1998 the court below entered an order finding Mother

in contempt of the September, 1992, divorce decree which . . . resulted in a deprivation of the Petitioner's [Father's] visitation privileges with the parties' minor child.

and thereby ordered specific visitation between Father and child

for the entire school vacation of the child for Christmas of 1998, including New Years Eve and New Years Day, beginning the day after school adjourns for the holidays and ending the day before the child is to return to school in January, 1999. This is to make-up for the visitation which the Petitioner [Father] was denied in December of 1997.

The certificate of service on the order stated that it was sent to Mother at Campus Drive in St. Charles, Missouri. The testimony at trial established that this was the proper address when the petition was filed in January, but apparently by the time of the hearing in November, Mother had moved. There was disputed testimony as to whether or not Father was aware of the move and did not notify his attorney of the new address.

Father and Mary each called Mother to notify her that the child would be picked up for Christmas. There was testimony at trial that the child was not to be found when Father went to retrieve the child pursuant to the contempt order. Mother testified that she first learned of the order when two police officers were standing in her living room on December 23. The next day she took the child to work with her. She was called to the courthouse where a judge heard the case and on December 24, 1998, the parties entered into a handwritten order[3] agreeing that Father

shall be awarded specific visitation with their son . . . from 2:40 p.m. 12/24/98 thru 2 p.m. 12/29/98 as a compromise to the above order issued 11/9/98.

Respondent, Justine Bourisaw, claims she received no notice of the contempt motion or order. The court file in Tenn. is unavailable due to poor weather and holiday closings.

---

[3]Mother signed her address as being on Rhythm Street in Overland, Missouri.

3

Both parties agree that their divorce decree needs to be modified to clarify visitation as they live in separate states. Both parties are encouraged to seek legal counsel to do so.

Both parties are making this compromise order in the best interest of their son and to avoid unnecessary intervention by law enforcement during the holiday season.

On January 7, 1999 Father filed a petition for change of custody alleging continued interference with visitation and potential harm due to Mother leaving the child with a step-father who was alleged to drink excessively and to have previously abused the eldest daughter. Mother admitted to having received this petition and never filing a response. Thereafter, Father was again denied visitation in the Summer of 1999 because Mother stated that if Father would not take both boys then he could have neither. However, due to problems between the other boy and Father's wife during the previous summer's visit, Father decided it was best if only his son came, but Mother refused.

Then on September 13, 1999, Father amended the petition to allege additional grounds for change of custody including Mother's refusal to allow the child to visit Father in the summer of 1999, the child's doing badly in school, including failing at least two courses, and Mother neglecting optometry and dental needs of the child. After a full hearing, the court below entered a lengthy eight page order on September 29, 2000 reciting much of the Marital Dissolution Agreement and further, finding in relevant part as follows:[4]

> 1. [Father] testified that when [Mother] moved her guard duty to Missouri he saw the child less and that after he got custody of Mary Keaveny in 1997, it got worse;
> 2. [Mother] confirmed what [Father] said about the summer visitation for 1999, that she insisted that [Father] take both children . . . or see neither;
> 3. [Mother] admits that she has known that the child needed braces for two years but has not paid the $500.00 required to have them put on and that [Father] has offered to pay one-half of the expenses and [Father's] insurance would pay $1,500.00 towards the expense;
> 4. [Father] testified that since he got custody of Mary in 1997, it has been more difficult to get [Mother] to give him her address and phone number;
> 5. [Father] filed a contempt petition in 1998. [Mother] admits she signed for it, that she filed no answer and that at that time she lived on Campus Drive. [Mother] further admits that [Father] called her prior to traveling to Missouri in December of 1998, and said he was coming to get the child. The evidence has been that Mary even called [Mother]. This was after this Court has awarded [Father] the entire Christmas break from school. Despite all this, on December 24, 1998, [Mother] took the child to work with her. Apparently, she got a call from the 21st Judicial Circuit in Missouri asking her to come down there, which she did. [Mother] told the Court that she received no notice of the contempt action. The significance here is not that

---

[4]We have numbered the paragraphs consecutively for purposes of convenience.

[Mother] violated this Court's Order of November, 1998, but the reason the Court gave [Father] the Christmas break from school for 1998, in the first place - it was because [Mother] did not allow [Father] to see the child at Christmas of 1997. Further, because of the actions of [Mother] in 1998, [Father] got to see the child only five days during Christmas break;

6. [Father] testified that he has concerns regarding the clothes the child comes with for visitation and further that in 1998, the child complained of headaches, so [Father] took him to the eye doctor and he needed new glasses, which [Father] got for him. [Father] further testified that prior to the problems with visitation, he would set-up doctor's appointments, but in the years of difficulty with visitation it has been difficult to do that;

7. [Father] further testified that the child is impressed with regular meals, has a short attention span and that when he is in trouble, he lies and is very nervous;

8. [Mother's] husband's treatment of Mary Keaveny was abusive;

9. The child . . . is at risk of substantial harm if he stays in the custody of [Mother] because of the following:

> a. the conduct of [Mother's] husband towards Mary Keaveny;
>
> b. [The child's] needs are not being met by [Mother], with regard to school and medical and dental;
>
> c. [Mother's] willingness to not allow a relationship between the child and his father.

## I.

The standard of review in child custody cases is *de novo* upon the record of the trial court, and findings of fact are accompanied by a presumption of correctness unless the preponderance of the evidence is otherwise. Rule 13(d) T.R.A.P., *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984). Further, a trial court is vested with broad discretion in matters of child custody, and an appellate court will not interfere with a decision of the trial court except upon a showing of erroneous exercise of that discretion. *Hoalcraft v. Smithson*, 19 S.W.3d 822, 827 (Tenn. Ct. App. 1999). Finally, in *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997), this court made the following observation:

> Custody decisions are factually driven and require the careful consideration of numerous factors. *See Holloway v. Bradley*, 190 Tenn. 565, 571, 230 S.W.2d 1003, 1006 (1950); *Scarbrough v. Scarbrough*, 752 S.W.2d 94, 96 (Tenn. Ct. App. 1988). Since these decisions often hinge on the parties' credibility, appellate courts are reluctant to second-guess trial judges who have observed the witnesses and assessed their credibility. *See Gilliam v. Gilliam*, 776 S.W.2d 81, 84 (Tenn. Ct. App. 1988). Accordingly, we decline to disturb custody decisions unless they are based on a material error of law or the evidence preponderates against them. *See Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984); *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996); *Griffin v. Stone*, 834 S.W.2d at 301.

II.

Father's change of custody petition is based upon his claims that Mother interfered with his rights to visitation, and thereby his relationship with his child, Mother's neglect for the medical and dental needs of the child, neglect of his educational needs, and subjecting him to an environment which was abusive and involved heavy drinking.

Courts are empowered to change custody "as the exigencies of the case may require." Tenn. Code Ann. § 36-6-101. The requirements for a change of custody are that the party seeking the change prove that the child's circumstances have materially changed in a way that could not have been foreseen at the time of the original decision, and that the child's best interest will be served by changing the existing custodial arrangements. *Adelsperger*, 970 S.W.2d at 485; *Musselman v. Acuff*, 826 S.W.2d 920, 922 (Tenn. Ct. App. 1991). Before engaging in a best interest analysis, the court must determine whether there has been a material change in circumstances.

> This decision [regarding custody] is not changeable except for "change of circumstances" which is defined as that which requires a change to prevent substantial harm to the child. Custody is not changed for the welfare or pleasure of either parent or to punish either parent, but to preserve the welfare of the child. Custody is not changed because one parent is able to furnish a more commodious or pleasant environment than the other, but where continuation of the adjudicated custody will substantially harm the child.

*Wall v. Wall*, 907 S.W.2d 829, 834 (Tenn. Ct. App. 1995).

As a general statement, "changed circumstances" include any material change of circumstances affecting the welfare of the child including new facts or changed conditions which could not be anticipated by the former decree. *Dalton v. Dalton*, 858 S.W.2d 324, 326 (Tenn. Ct. App. 1993). As with decisions making the original grant of custody, the decisions turn on the unique facts of each case, and there is no exact rule for determining when a change of circumstances is material enough to trigger proceeding with a best interest analysis regarding a modification of the existing custody arrangement. *Taylor v. Taylor*, 849 S.W.2d 319, 327 (Tenn. 1993); *Solima v. Solima*, 7 S.W.3d 30, 32 (Tenn. Ct. App. 1998). However, the change must involve the child's circumstances rather than either or both parents. *Hoalcraft v. Smithson*, 19 S.W.3d at 829. Additionally, the changed circumstances must affect the child's well-being in some material way. *Id.*, *Dalton*, 858 S.W.2d at 326.

Because a finding of a material change in the child's circumstances is a requisite threshold determination, *Placencia v. Placencia*, 48 S.W.3d 732, 736 (Tenn. Ct. App. 2000), we begin our review with the trial court's findings in that regard. The court below specifically found that the child

6

would be in substantial harm if left with Mother.[5]  The court listed several reasons or factors that constituted harm to the child including the conduct of Mother's husband towards Mary; the Mother's failure to meet the child's needs with regard to school and medical and dental care; and Mother's unwillingness to allow an unimpeded relationship between the child and his father.

Much of the relevant evidence in this case was disputed at trial.  For example, the nature of the strife between Mother's daughter Mary and Mother's new husband, is described differently by Mary and by Mother.  Mary testified that her step-father had abused her by throwing her against a wall and, on another occasion, he dragged her up the stairs by her hair and bra strap and then hit her twice and threw her head into the headboard of her bed.  Apparently, there were several altercations. In 1995 or 1996, Mary came to live with Father, after the first episode of physical violence.  Mother relinquished temporary custody of Mary to Father at that time.  Mary lived with Father for approximately six months before returning the Mother's house.  In 1997, Mary again left her Mother's house, apparently because of another altercation, and returned to Father's house.  Mary stated that after the physical altercations in the fall of 1997 she did not feel safe living in her Mother's house.  Father's wife, Marty Roache, drove to Missouri, took Mary to the emergency room for treatment of bruises, and returned home with her.

Mother disputes Mary's testimony, claiming that neither she nor her husband had physically abused Mary.  She claimed that Mary was the aggressor in the first incident.  The second incident, which Mother blamed on Mary's drug use, resulted in a physical altercation between Mary and Mother, and when the stepfather learned of it, he went upstairs to deal with Mary.

Mary had lived with Father and his new wife for the three years preceding the hearing.  Her grades drastically improved after moving into his home, and she has been attending Austin Peay State University at the encouragement of Father.  After Mary returned to Father's home, Mother attempted to regain custody of Mary through court action, but she was unsuccessful.[6]  It was this 1997 court battle, which apparently resulted in a court ruling giving custody of Mary to Father, who was not her biological parent, which Father says triggered Mother's lack of cooperation in his efforts to visit and communicate with his son.

Mary testified that the incidents of physical violence occurred in the presence of Mother but that the child was in his room at the time.  Mother argues the son was unaffected by these incidents; Father asserts son was aware of them and anxious because of them.  The testimony regarding Mother's new husband's physical assaults on Mary involved incidents occurring before 1997, and Father was aware of the incidents when they happened.  Yet, he waited until January of 1999 to seek

---

[5]We interpret the language of this holding as a finding that circumstances had developed that negatively affected the well-being of the child in a material way.  *See Hoalcraft*, 19 S.W.3d at 830 ("[T]he correct inquiry was whether the childred would be harmed in any way if [the custodial parent] retained custody.")

[6]The record does not include orders from this proceeding, but the parties testified about it, including Mother's admission that she had been ordered by the Juvenile Court of Montgomery County to return Mary's personal belonging to her in 1997.

a change of custody. As a result of Mary's move to his house, Mother's animosity to Father apparently increased and she attempted to interfere with his relationship with his son. His inability to see his son for long periods of time may have increased his anxiety about his son's situation, so that a combination of circumstances led him to seek a change of custody. While we do not discount Father's concern over the treatment of Mary by Mother's new husband, we note there is no evidence that the son was ever treated in a similar manner.

There are, however, additional allegations of changed circumstances. Change of custody is not appropriate as a method to punish a parent for failing to comply with court orders regarding visitation. *Adams v. Cooper*, No. M1999-02664-COA-R3-CV, 2000 WL 225573, at *7 (Tenn. Ct. App. Feb. 29, 2000) (no Tenn. R. App. P. 11 application filed). However, a custodial parent's actions which interfere with the relationship between the child and non-custodial parent may constitute a material change of circumstances. At the time of the initial grant of custody, the court and the parties anticipate that the custody and visitation arrangements will be complied with. The initial custody arrangement is intended to enhance the child's relationship with each parent. *Adelsperger*, 970 S.W.2d at 484. Both the courts and the legislature have recognized the importance to the child's well-being of maintaining a relationship with the noncustodial parent. *Wilson v. Wilson*, 987 S.W.2d 555, 564 (Tenn. Ct. App. 1998); Tenn. Code Ann. § 36-6-106(10) (Supp. 2000). A custodial parent's obstruction of the noncustodial parent's visitation rights or conduct to preclude continuation of the parent-child relationship is a sufficient change of circumstances to warrant further consideration of a change of custody. *Wilson v. Tittle*, No. M2000-00115-COA-R3-CV, 2000 WL 1207247, at *2, 4, 6 (Tenn. Ct. App. Aug. 25, 2000) (*perm. App. denied* Mar. 12, 2001).

Mother herein characterizes the post-1997 incidents as "a couple of glitches in visitation." Because we do not agree with that characterization, we need not address the issue of whether such "glitches" can constitute a material change of circumstances. Whether a custodial parent's conduct has obstructed communication between the child and the noncustodial parent so as to constitute interference with or attempt to damage the parent-child relationship is, ultimately, a question of fact to be determined in the context of a particular case.

The trial court found that Mother was not willing to allow a relationship between Father and his son and that Mother did not recognize the importance of a close and continuing relationship between the child and Father "even though she acknowledges that he is a good father." The court also found that Mother had not allowed Father to see his son at Christmas 1997, and because of her actions Father got to see his son for only five days during the 1998 Christmas school break even though the court had intended him to get extended visitation to make up for the lost 1997 visitation.[7] The court also found that Mother admitted that she insisted that Father take both his own child and

---

[7]The parties have disputed whether Mother got notice of the Tennessee court order regarding the 1998 Christmas visitation and whether Father had Mother's correct address. They also dispute when she had notice Father was coming to get the child and why she took the child to work with her the day Father was to pick him up. The trial court made it clear, however, that its concern was that Father only got five days of visitation then although he should have gotten more to make up for the previous Christmas. Mother acknowledged that it was her objections and opposition that resulted in the Christmas Eve order giving Father five days.

the child's half brother for summer visitation in 1999 or she would not allow the visitation. Father and his current wife testified that Mother made Father's exercise of his visitation rights more difficult after Mary came to live with them. Father testified that telephone communication with his son had been made more difficult or obstructed by Mother since the 1997 court action giving him custody of Mary. The only way he could reach his son was to have Mary call first and ask to speak to the child then put Father on the phone.

The trial court also found that the child's school, medical, and dental needs were not being met by Mother. There was testimony by Father that when he got his son one summer, he had ringworm on his head which required medical attention. Further, on one occasion the child complained of headaches and upon an eye exam, it was discovered that he needed a new prescription. Finally, Mother admitted that the child had needed braces for two years and, despite Father's insurance paying $1,500 of the approximate $3,000 costs, and Father's offer to pay half of anything not covered by insurance, the child still did not have braces at the time of the hearing. Mary testified that while she lived with Mother neither she nor Father's son had visited the doctor or dentist regularly. We note that a neglect of general dental needs has been deemed a material change of circumstances. *Baker v. Baker*, No. W1999-02660-COA-R3-CV, 2000 WL 1346650, at *1-2 (Tenn. Ct. App. Sept. 15, 2000) (no Tenn. R. App. P. 11 application filed) (finding that the inability of a parent to properly care for a child, as evidenced by neglect of the child's dental needs, was a serious change of circumstances and that the initial custody arrangement necessarily contemplated the custodial parent would provide for the child's basic needs).

Finally, Father noticed his son had problems reading and was doing poorly in school. According to Mother, the child failed some quarters of a course or two, and had been required to attend summer school in 1999. Mother testified, however, that she helped her son with homework and was actively involved with the child's resource teacher in addressing his needs. On the other hand, Mary testified that no one helps the child with his homework on the times she has visited in Mother's home.[8]

The evidence does not preponderate against the trial court's finding that a material change of circumstances has occurred which affect the child's welfare. Therefore, the court properly proceeded to consider whether a change of custody was in the child's best interest.

III.

If a material change in circumstances is found, then the court seeks to devise a custody arrangement that is in the best interest of the child. *Varley v. Varley*, 934 S.W.2d 659, 665-66 (Tenn. Ct. App. 1996) (citing *Koch v. Koch*, 874 S.W.2d 571, 575 (Tenn. Ct. App. 1993)); Tenn. Code Ann. § 36-6-106 (Supp. 1998). The party seeking a change in custody has the burden of proving by the preponderance of the evidence that a change of custody is in the child's best interest. *Musselman v. Acuff*, 826 S.W.2d 920, 922 (Tenn. Ct. App. 1991). "In child custody cases, the welfare and best

---

[8]Although Mary has lived with Father for three years, she has had visits with Mother in Mother's home.

9

interest of the children are the paramount concern and the determination of the children's best interest must turn on the particular facts of each case." *Akins v. Akins*, 805 S.W.2d 377, 378 (Tenn. Ct. App. 1990) (citing *Holloway v. Bradley*, 190 Tenn. 565, 570-72, 230 S.W.2d 1003, 1006 (1950)). In determining what is in the best interest of the child, the court is to assess the comparative fitness of the parties in light of the particular circumstances of the case. *Ruyle v. Ruyle*, 928 S.W.2d 439, 442 (Tenn. Ct. App. 1996); *Matter of Parsons*, 914 S.W.2d 889, 893 (Tenn. Ct. App. 1995). "There are literally thousands of things that must be taken into consideration in the lives of young children, and these factors must be reviewed on a comparative approach." *Bah v. Bah*, 668 S.W.2d 663, 666 (Tenn. Ct. App. 1983) (internal citations omitted).

The trial court herein conducted a comparative fitness analysis using the factors enumerated in Tenn. Code Ann. § 36-6-106(a), which include the following:

(1) The love, affection and emotional ties existing between the parents and child;
(2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;
(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment . . . .
(4) The stability of the family unit of the parents;
(5) The mental and physical health of the parents;
(6) The home, school and community record of the child;
(7) The reasonable preference of the child if twelve (12) years of age or older.
(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person . . . .
(9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child; and
(10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

After discussing most of these factors in a comparative context, the court found that it was in the child's best interest that primary physical custody be changed to the Father. Specifically, the court found, while most things were equally applicable to both parents, that Father's attitude to providing for the child's food, clothing, medical care, etc. was greater; the environment with Mother was not stable considering the abuse to Mary by the step-father; the child's school record was waning in the care of Mother and in contrast, Mary's school record drastically improved once she was placed in Father's care; and Mother "does not recognize the importance of a close and continuing relationship between the child and [Father] even though she acknowledges that he is a good father."

We find the evidence does not preponderate against the court's finding that the child's best interests are served by the modified custody arrangement ordered by the court. Therefore, change of custody is affirmed.

IV.

We affirm the judgment of the trial court and remand this case for any further proceedings which may be required. Costs of this appeal are taxed against appellant, Justine Bourisaw, for which execution may issue if necessary.

_____
PATRICIA J. COTTRELL, JUDGE