IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 7, 2004

## TIMOTHY W. NEVES v. ERICA REGAN NEVES (ARRELL)

Appeal from the Chancery Court for Lewis County
No. 4549      Donald P. Harris, Chancellor

No. M2003-02269-COA-R3-CV - **Filed December 13, 2004**

This case involves a custody dispute between the parents of one daughter. Mother lives in Belgium, and Father, the primary residential custodian, currently lives in Lewis County, Tennessee, although he has also lived with his daughter in Hawaii, Oregon, and Washington State at various times since the parties' separation in 1998. Father has refused to allow most of Mother's visitation since the divorce became final, has interfered with communication between Mother and Daughter, and has convinced Daughter to falsely accuse her maternal grandfather and stepfather of sexual abuse. The trial court found that these occurrences amounted to a material change in circumstances and found that it would be in the best interest of Daughter to make Mother her primary residential custodian and to allow Daughter to move to Belgium with Mother. We affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed and Remanded**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and PATRICIA J. COTTRELL, J., joined.

William C. Barnes, Jr., Columbia, Tennessee, for the appellant, Timothy W. Neves.

James Yeiser Ross, Waynesboro, Tennessee, for the appellee, Erica Regan Neves (Arrell).

### OPINION

The parties in this case, Timothy Neves (Appellant), and Erica Neves Arrell (Appellee), were married in 1994. The child at issue in this case (hereinafter referred to as "Daughter") was born to the marriage later that same year. The parties initially separated in 1998 and obtained a divorce in the State of Oregon in May of 1999.

At the time of the divorce, Mother was not represented by counsel and, due to poor health and financial hardship, agreed to allow Father to have primary residential custody of Daughter. The divorce judgment allowed for specific visitation by Mother, the non-custodial parent. Under the

terms of the agreement, if either party chose to move out of state, Mother would have visitation for the majority of the summer vacation, one-half of Christmas vacation, every other Thanksgiving, and every spring break . Each parent was to pay one-half of the cost of the round-trip ticket.

Both parents chose to leave the State of Oregon. On March 3, 1999, Mother moved to Belgium with her current husband, and shortly after the divorce was final, Father moved to Washington State with his current wife. In May of 2000, Father moved again to Hawaii to be close to his family. Then, in the summer of 2002, Father moved to Tennessee.

Mother began having problems obtaining her visitation shortly after the divorce became final, as Father stated that he would not allow Daughter to visit Mother in Belgium citing fears that she would not be returned. After the divorce was final in May 1999, Mother decided to remain in Oregon through the month of July to exercise her summer visitation with Daughter. However, she was not able to see Daughter again until spring 2001. Father refused to allow Daughter to visit Mother for Christmas 1999, spring break 2000, summer of 2000, and Christmas 2000.

In August of 2000, Mother filed a Motion for Enforcement of Parenting Time, which resulted in a judgment in her favor from the Oregon court in December of 2000, but that court also transferred jurisdiction for modification of custody to the family court in Hawaii, as Father and Daughter were living in Hawaii at the time. Father still refused to allow the court ordered visitation, immediately filing a Motion for Post Decree Relief in the Hawaii family court.

Father asked the Hawaii court to severely restrict Mother's visitation. The Hawaii court appointed a guardian ad litem who throughly reviewed the case and recommended that Mother have her visitation. As Mother had not seen the child in almost two years, the guardian ad litem recommended that Mother and Daughter begin with some "warm up visitation" in the United States in May of 2001. The Hawaii court issued an Order adopting the guardian ad litem's recommendations and ordering Father to allow Mother's visitation beginning with the "warm up" visitation but, ultimately, allowing visitation in Belgium. Visitation resumed in Hawaii during spring break of 2001. Mother and Daughter then spent her summer 2001 visitation with Mother's parents in Oregon. All visitation went very well.

That fall, the terrorist attacks of September 11 occurred. As Father was extremely disturbed about the possibility of more terrorist attacks over Christmas, the parties mutually agreed to forego Christmas in Belgium that year, to make up Mother's Christmas visitation the following year, and to return to their regular visitation schedule thereafter. However, future visitation did not go as planned. Father refused to allow Daughter to make the trip to Belgium for spring break 2002; Father then moved to Tennessee in the summer of 2002. Daughter finally made her first trip to Belgium for the summer of 2002, and by all accounts, the visitation went very well. But, shortly after the summer 2002 visitation, Mother attempted to enter into a dialogue with Father regarding Christmas visitation and how expenses should be split, and Father refused to discuss splitting of any Christmas expenses and, once again, would not allow Daughter to visit Mother in Belgium. Mother subsequently made arrangements for Christmas visitation to occur in Oregon. She purchased a ticket

for Daughter to fly with her from Atlanta to Oregon. According to Mother, the plan was for Father to bring Daughter to the Atlanta airport where Mother and Daughter would fly together to Oregon to spend Christmas with Mother's family. Father never showed up with Daughter at the Atlanta airport, and the Christmas 2002 visitation did not take place. Mother was also denied her visitation for spring break 2003 and summer 2003.

In December of 2002, Father filed a Petition to Modify the Custody Arrangements in the Chancery Court of Lewis County, Tennessee. This matter was heard on August 1, 2003. After the hearing, the trial court found a material change of circumstances that warranted modification of the custody arrangement and found that such modification was in the child's best interest. Under the Parenting Plan incorporated into the trial court's Order, Mother was given primary residential custody with Father getting visitation every other Christmas, every spring break and summers from June 15th until August 15th. Father appeals the trial court's decision.

A trial court's custody determination is reviewed *de novo* with a presumption of correctness as to the trial court's findings of fact unless the evidence preponderates against these findings. Tenn. R. App. P. 13(d). In addition, it has long been held that the trial judge is in the best position to determine the credibility of the witnesses, and, thus, their determinations are entitled to great weight on appeal. *Whitaker v. Whitaker*, No. E2002-00847-COA-R3-CV, 2003 WL 465873, at *5 (Tenn.Ct.App. Feb. 25, 2003); *Barnes v. Barnes*, No. W2002-00428-COA-R3-CV, 2002 WL 31387268, at *1 (Tenn.Ct.App. Oct. 23, 2002).

The law in Tennessee with regard to modification of child custody is now well-settled. The trial court must first find a material change in circumstances that has occurred since the initial custody determination and, also, find that a modification of custody is in the child's best interest.

> The principal issue in this case concerns the proper standard to be applied to a petition to modify custody from one parent to the other parent. This issue is largely resolved by our recent decision in *Blair v. Badenhope*, 77 S.W.3d 137 (Tenn. 2002). *Blair* involved a custody dispute between a parent and a non-parent. We concluded that once a valid order of custody has been issued, subsequent custody modification proceedings should apply the "standard typically applied in parent-vs-parent modification cases: that a material change in circumstances has occurred, which makes a change in custody in the child's best interests." *Id*. at 148. As explained in *Blair*, the "threshold issue" is whether a material change in circumstances has occurred after the initial custody determination. *Id.* at 150. While "[t]here are no hard and fast rules for determining when a child's circumstances have changed sufficiently to warrant a change of his or her custody," the following factors have formed a sound basis for determining whether a material change in circumstances has occurred: the change "has occurred after the entry of the order sought to be modified," the change "is not one that was known or reasonably anticipated when the order was entered," and the change "is one that affects the child's well-being in a meaningful way." *Id.* (citations omitted). We note that a parent's change in

-3-

circumstances may be a material change in circumstances for the purposes of modifying custody if such a change affects the child's well-being.

If a material change in circumstances has occurred, it must then be determined whether the modification is in the child's best interests. This determination should be made according to the factors enumerated in Tennessee Code Annotated section 36-6-106.

*Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002).

The following year, the Tennessee Supreme Court reiterated the proper standard for modifying custody decisions.

We clarified that this standard requires the trial court to engage in a two-step process to make its final custody determination. First, the court must determine whether a material change in circumstances has occurred after the initial custody determination. Although there are no bright-line rules for determining when such a change has occurred, there are several relevant considerations: (1) whether a change has occurred after the entry of the order sought to be modified; (2) whether a change was not known or reasonably anticipated when the order was entered; and (3) whether a change is one that affects the child's well-being in a meaningful way. *Kendrick*, 90 S.W.3d at 570; *see also Blair*, 77 S.W.23d at 150.

Second, after finding that a material change in circumstances has occurred, the trial court must determine whether modification of custody is in the child's best interests using the factors enumerated in Tennessee Code Annotated section 36-6-106 (2001).

*Cranston v. Combs*, 106 S.W.3d 641, 644 (Tenn. 2003).

In addition, it has been held that interference with the parent-child relationship by the custodial parent may be a material change in circumstances.

However, a custodial parent's actions which interfere with the relationship between the child and non-custodial parent may constitute a material change of circumstances. At the time of the initial grant of custody, the court and the parties anticipate that the custody and visitation arrangements will be complied with. The initial custody arrangement is intended to enhance the child's relationship with each parent. *Adelsperger*, 970 S.W.2d at 484. Both the courts and the legislature have recognized the importance to the child's well-being of maintaining a relationship with the noncustodial parent. *Wilson v. Wilson*, 987 S.W.2d 555, 564 (Tenn.Ct.App. 1998); Tenn. Code Ann. § 36-6-106(10) (Supp. 2000). A custodial parent's obstruction of the non-custodial parent's visitation rights or conduct to preclude continuation of the parent-child relationship is a sufficient change of circumstances to warrant further consideration of a change of custody. *Wilson v. Tittle*, No. M2000-

00115-COA-R3-CV, 2000 WL 1207247, at *2, 4, 6 (Tenn.Ct.App. Aug. 25, 2000) (*perm. App. denied* Mar. 12, 2001).

*Roache v. Bourisaw*, No. M2000-02651-COA-R3-CV, 2001 WL 1191379, at *6 (Tenn.Ct.App. Oct. 10, 2001).

In addition to the chronic obstruction of Mother's visitation, Mother also alleged continual problems communicating with Daughter, either through telephone conversations or e-mail. These problems began shortly after Mother's summer 1999 visitation in Oregon when Mother received an e-mail from Father stating:

> I am writ-ting (sic) to ask you to please . . not call. I know it is hard on you . . . but you have no idea what it puts [Daughter] through.
> She was in bed at 8:30 but cried till 10:30 for you. It is very hard on her and makes it difficult for me to reason with her. I am truly sorry!!! If you want I will try to make an effort to make some voice mails for you of her . . and any questions about her, e-mail me and I will do my best to write.

Father has continuously refused to communicate in any way with Mother regarding Daughter. Further, when a phone call occurs between Mother and Daughter, Father simply hands the phone to Daughter without so much as speaking to Mother. This has repeatedly placed Daughter in between her parents when exchange of information is necessary. He then monitors Daughter's phone calls and corrects her when she makes statements of which he does not approve. Most recently, significant and unreasonable problems with telephone calls between Mother and Daughter have resulted from Father and his wife not having a hard line telephone in their home. Father and his wife each have a cell phone. During the day, when Daughter is at home, Father takes his cell phone to work. Father's cell phone number is the only phone number that was given to Mother, as Father and his wife refused to allow Mother access to his wife's telephone number. Thus, Mother is unable to communicate with Daughter during the day and can only place phone calls at times specifically designated by Father. Father also claims to not have adequate internet capability so that Mother and Daughter could communicate through e-mail.

In addition, Mother has been denied access to Daughter's school records, medical records, and counseling records. Mother has tried to speak with Daughter's school teachers and counselors, but, due to Father's requests, was not allowed to have conversations with any of these people.

In an attempt to find evidence to help his case, Father made allegations a few weeks prior to trial of sexual abuse against Daughter by both her maternal grandfather and Mother's husband. After hearing all the evidence in this case, the trial judge had this to say:

> In my opinion, those things never happened and the reason I say they never [happened] is this. I have here a father who from the time this couple were divorced has done nothing but try to interfere with the visitation of the mother of this child.

He has filed actions in three separate states now and every one of the actions had as a purpose to limit the visitation to be exercised by the mother. That's what this one was, that's what the one in Florida was, that's what the one in Oregon was and he has been rebuffed at every point and he continues not to follow the court orders.

In this case he alleged that the mother of this child was having sex in front of the child and he didn't - - totally unfounded. He didn't even bother to testify about why he thought that might be true.

He goes out two weeks before this court hearing and in effect gets him a witness. He has - - hires a counselor, Ms. Mobley, and he sees that that child gets to her twice and tells this story somehow and what makes it most untrue and why I'm really satisfied that it is untrue is that she tells it about not only one man, but about two men, all the men that she would be around if she gets to exercise visitation. It's so incredible that its not to be believed.

And then finally, how does he use this information. If I were a parent and I wanted to protect my child, the first person I think I would have called would be the child's mother and let her tell - - let the child tell the mother what has been going on so that the mother can assist in protection, but no, he's refused at all to tell her about what was said until today. Today was the first time this mother knew.

. . . .

I find that these false allegations are as abusive to this child almost as what he's alleged to have happened. I think that his actions in that regard and his actions in refusing to allow the child to visit her mother and refusing to talk to the mother about matters relating to the child, interfering with the phone conversations by admittedly taping them on one - - during one stretch and now apparently monitoring most of the calls that are made and then of course just cutting them off altogether constitutes a sufficient change of circumstances to modify the previous order of the Court.

I note that she's done well, but like I say, I consider this encouragement to make false allegations and the other treatment that this child received to be abusive and I find that the custody should be joint between these people. The mother will be the primary residential parent.

After reviewing all testimony and evidence presented in this matter, we cannot say that the evidence preponderates against the trial court's findings of fact. Father admitted in testimony that he knew Mother was to be allowed summer, spring and Christmas visitation and understood that this visitation had been ordered by the courts. Even after the Oregon court ordered enforcement of Mother's visitation and the Hawaii court agreed that Mother should get the previously ordered visitation, Father still continued to obstruct Mother's visitation and interfere with her relationship with Daughter. Father and his wife also admitted to correcting Daughter during phone calls with Mother.

The role of custodial parent carries with it a particularly important duty to foster a relationship between the child and the non-custodial parent. Father has not only abrogated this responsibility, but has intentionally placed every possible barrier between Daughter and Mother, including preventing visitation, impeding phone calls, blocking Mother's efforts to talk with Daughter's teachers and counselors, precluding Mother from obtaining Daughter's medical, school, and counseling records, and averting any communication between himself and Mother. This behavior by Father, in addition to the false allegations of sexual abuse, certainly constitute a material change of circumstances.

In determining the best interests of the child, we turn to factors set out by the legislature in Tennessee Code Annotated section 36-6-106(a) (2001):

(1) The love, affection and emotional ties existing between the parents and child;

(2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that where there is a finding, under § 36-6-106(8), of child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, by one (1) parent, and that a non-perpetrating parent has relocated in order to flee the perpetrating parent, that such relocation shall not weigh against an award of custody;

(4) The stability of the family unit of the parents;

(5) The mental and physical health of the parents;

(6) The home, school and community record of the child;

(7) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that where there are allegations that one (1) parent has committed child abuse, [as defined in § 39-15-401 or § 39-15-402], or child sexual abuse, [as defined in § 37-1-602], against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected thereto. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

(9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child; and

(10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to

facilitate and encourage a close and continuing parent-child relationship between the chid and the other parent, consistent with the best interest of the child.

In recognition of the many variables and factors that come into play in each individual case, this Court has stated:

> "In child custody cases, the welfare and best interest of the children are the paramount concern and the determination of the children's best interest must turn on the particular facts of each case." *Akins v. Akins*, 805 S.W.2d 377, 378 (Tenn.Ct.App. 1990) (citing *Holloway v. Bradley*, 190 Tenn. 565, 570-72, 230 S.W.2d 1003, 1006 (1950)). In determining what is in the best interest of the child, the court is to assess the comparative fitness of the parties in light of the particular circumstances of the case. *Ruyle v. Ruyle*, 928 S.W.2d 439, 442 (Tenn.Ct.App. 1996); *Matter of Parsons*, 914 S.W.2d 889, 893 (Tenn.Ct.App. 1995). "There are literally thousands of things that must be taken into consideration in the lives of young children, and these factors must be reviewed on a comparative approach." *Bah v. Bah*, 668 S.W.2d 663, 666 (Tenn.Ct.App. 1983) (internal citations omitted).

*Roache*, 2001 WL 1191379, at *8.

In reviewing the factors in this case, we find that many of these factors bode equally for both parents. There appear to be love, affection and emotional ties existing between Daughter and both parents. Both parents appear ready, willing and able to provide the child with food, clothing, medical care and other necessary care. Both parents, also, have a stable family unit, and both parents currently seem to be in good mental and physical health. Although Daughter has lived primarily with Father since 1999, Father has made frequent moves during that period of time, so we cannot say that her time with Father has represented a large measure of continuity.

The factors that tip the best interest analysis in the direction of Mother are (1) the evidence of emotional abuse, in that Daughter was evidently subjected to some type of coercion to either convince her that she was sexually molested by her stepfather and grandfather or to convince her that she should lie regarding such molestation, and (2) Father's insistence on interfering with Mother's visitation and relationship with Daughter. Father has definitely not demonstrated "past and potential for future performance of parenting responsibilities, including the willingness and ability . . . to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent. . . ." Mother has stated that she will allow all scheduled visitation with Father, encourage phone calls, and do everything in her power to assist Daughter with maintaining a relationship with Father. As has been demonstrated over the last four years, Father will not. *See Burke v. Burke*, No. M2000-01111-COA-R3-CV, 2001 WL 921770, at * 4-5 (Tenn.Ct.App. Aug. 7, 2001).

Although Daughter will be moving to live with Mother in Belgium, she will live in a neighborhood near an American military base with many English speaking families and will be

attending an English speaking school located five minutes from her home. Mother has also already located an English speaking counselor in the event Daughter needs help with the adjustment. Although this move will likely be initially difficult for Daughter, the importance of having a relationship with both parents outweighs any initial hardship. As Father has moved with Daughter more than three times in the last five years, Daughter has shown her ability to adapt to such life changes.

We agree with the trial court that Father's actions amount to a material change of circumstances and that it is in Daughter's best interests that primary residential custody be given to Mother with Father having visitation as outlined by the trial court.

The judgment of the trial court is in all respects affirmed and the case remanded to the trial court for such further proceedings as may be necessary. Costs are assessed against Appellant.

_____
WILLIAM B. CAIN, JUDGE