IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
OCTOBER 9, 2007 Session

## SHEARER REBECCA AGEE v. DAVID STEVEN AGEE

**Direct Appeal from the Chancery Court for Crockett County**
**No. 8037      George R. Ellis, Chancellor**

---

**No. W2007-00314-COA-R3-CV - Filed May 16, 2008**

---

This is an appeal from the trial court's modification of a child's custody due to a material change in circumstances. Mother/Appellant appeals the trial court's change of custody of her minor child to Father/Appellee. Specifically, Mother/Appellant asserts that the evidence does not support the finding of a material change in circumstances and also raises issues concerning trial court's reliance on certain evidence. Finding no error by the trial court, we affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the court, in which HOLLY M. KIRBY, J., joined, and W. FRANK CRAWFORD, J., did not participate.

Betty Stafford Scott, Mary Jo Middlebrooks, Jackson, TN, for Appellant

Magan White, Jackson, TN, for Appellee

**OPINION**

**Facts and Procedural History**

On September 8, 2000, Appellant, Shearer Rebecca Agee (hereinafter, "Mother") and Appellee, David Steven Agee (hereinafter, "Father"), were married. In June of 2001, the parties separated; and, on July 5, 2001, Mother filed for divorce. After separating, Mother gave birth to the parties' only child (hereinafter, "R. I. A" or "the child") on February 8, 2002. In conjunction with their divorce, the parties entered into a Marital Dissolution Agreement and a Permanent Parenting Plan, under which Mother was designated as the Primary Residential Parent (hereinafter, "PRP"). The Final Decree of Absolute Divorce was entered on August 28, 2002.

In early 2004, Mother learned that her National Guard Unit was on an "alert order" for a possible two (2) year deployment to Iraq. In July of 2004, Mother was officially notified that her unit would be deployed to Iraq. On July 9, 2004, Mother allegedly became suspicious that R. I. A. was being sexually abused while in Father's custody.[1] The next day, Mother contacted the National Guard and was removed from the "mobilization and deployment manning roster." The following Monday, July 12, 2004, Mother reported her allegations to the Milan Police Department. Mother also contacted the Department of Children's Services (hereinafter, "DCS") and was directed to take R. I. A. to the Memphis Sexual Assault Resource Center (hereinafter, "MRC").

On August 23, 2004, the MRC performed a visual rape examination on R. I. A. The examination was inconclusive. Thereafter, and upon MRC's recommendation, Mother also starting collecting and dating R. I. A.'s garments after her return from visits with Father. On August 27, 2004, Mother took three garments to the Milan Police Department. Around this time, Mother also began taking R. I. A. to see Julia Austen, a licensed clinical social worker.

The Milan Police Department interviewed Father and took samples of his blood, but did not process or test R. I. A.'s garments. Mother retrieved R. I. A.'s garments and delivered them to Work Care Resources, an independent laboratory in Jackson, Tennessee. Tests were performed on the garments and yielded inconclusive results. Following Work Care Resources' testing, the Tennessee Bureau of Investigation (TBI) tested the garments. The TBI test results were negative for the presence of bodily fluids. No criminal charges were ever brought against Father.

In October of 2004, Mother took R. I. A. to the emergency room at Jackson-Madison County Hospital, alleging that R. I. A. complained of buttocks and stomach pain. Mother told the hospital staff that R. I. A. might have been sexually assaulted. The staff conducted a visual examination of R. I. A.'s genitalia and directed Mother to return in a few days for a follow-up exam. Mother returned, as directed, and the staff examined the R. I. A. again. Their examination yielded inconclusive results.

On October 6, 2004, Father filed a Petition for Change in Primary Residence, alleging that Mother had wrongfully accused him of abuse, and had forced R. I. A. to undergo horrific medical

---

[1] This Court has thoroughly reviewed the specific allegations lodged against Father. However, in the interest of protecting the privacy of the parties, and especially of the child, we will not enumerate the allegations herein.

examinations, which were harmful to the child. Father further alleged that these accusations were made in order to alienate R. I. A. from him. On October 28, 2004, Mother filed a Response and a Motion for Civil Contempt, alleging that Father had violated various provisions of the parenting plan. On November 22, 2004, Father filed an Answer, denying all the material allegations of Mother's motion.

When R. I. A. returned from visiting Father over Christmas break, Mother asked her neighbor, a registered nurse, to examine R. I. A.'s genital area. On December 30, 2004, Mother filed a Motion for Civil and Criminal Contempt alleging that Father exercised more parenting time than he was entitled to under the Parenting Plan. On January 10, 2005, Father filed a Response, denying all of Mother's material allegations. On January 14, 2005, Father filed a Petition for Contempt, alleging that Mother had assaulted him, and had made derogatory remarks in front of their child. Additionally, Father filed a Motion for Custodial Evaluation requesting that the Chancery Court order the parties to submit to psychological evaluations.

On January 25, 2005, Mother filed a Motion to Terminate or Require Supervised Parenting Time, alleging that Father had sexually abused R. I. A.. Shortly thereafter, on February 1, 2005, Mother filed a Petition for a Restraining Order, and the Chancery Court issued a temporary restraining order that same day. Father responded on February 4, 2005, denying Mother's allegations and filing his own Petition for Contempt, alleging that Mother refused to allow him visitation with R. I. A. On February 7, 2005, Father filed an Answer to the Petition for the Restraining Order and denied all material allegations contained therein. After the restraining order was issued, Mother took R. I. A. to the UT Medical Group for a follow-up visit, stemming from the MRC visit in August of 2004. Another exam was performed, and, again, all tests were inconclusive.

The Chancery Court held a hearing on February 23, 2005. In April of 2005, the trial court issued an Order, requiring both parties to submit to a Center for Children in Crisis Evaluation (hereinafter, "CCP Evaluation").[2] The Chancery Court also continued the hearing on Mother's temporary restraining order until June 6, 2005.

Pursuant to the Chancery Court's April order, the parties submitted themselves to a CCP psychological evaluation at the LeBonheur Center for Children and Parents (hereinafter, "LeBonheur").[3] After conducting individual psychological evaluations of Father, Mother, and R. I. A., LeBonheur opined that it was extremely unlikely that Father had sexually abused the child. LeBonheur further opined that the relationship between Father and R. I. A. was positive, and that Mother exhibited many personality traits which suggest Borderline Personality Disorder. LeBonheur

_____

[2]The Center for Children in Crisis is part of the LeBonheur Children's Medical Center, Center for Children and Parents ("CCP").

[3]Several LeBonheur psychologists and licensed clinical social workers conducted the evaluation of the parties and R. I. A. through a myriad of observations, interviews, assessments of parent-child interactions, and psychological tests. A "Multi-disciplinary Team Summary" report conveyed LeBonheur's findings and represented a comprehensive summary of each of the professional's conclusions.

concluded that, as between the two parents, Father "would clearly be the better primary residential parent, by far."

The trial court reviewed LeBonheur's findings and allowed Father to have supervised visitation with R. I. A. The court also ordered that R. I. A. attend counseling with a licensed child psychologist, with the parties being required to participate collaboratively in R. I. A.'s therapy. In addition, Mother was ordered to complete long-term intensive therapy with a licensed therapist, skilled in personality disorders. R. I. A. began counseling with Dr. David Pickering, and both Father and Mother participated collaboratively in that therapy. From June 2005 until November 2005, Mother attended therapy sessions with Dr. Richard Spring, a licensed psychologist. In a letter dated October 10, 2005, Dr. Spring released Mother, stating that she had complied with the individual therapy requirements and that he had not "seen anything clinically that would confirm the LeBonheur report saying that she has Borderline Personality Disorder."

On October 11, 2005, the Chancery Court extended Father's visitation to include visits in his home and required the parties to continue seeing Dr. Pickering for family counseling. Shortly thereafter, Mother learned that her job with the Army's Counter Drug Unit would be terminated due to lack of funding. Mother sold her residence and notified Father of her relocation to Fulton, Kentucky. Both Father and Dr. Pickering objected to Mother's moving outside the court's jurisdiction. In response to their objections, Mother moved to South Fulton, Tennessee, to live with her mother and to remain within the trial court's jurisdiction.

On December 12, 2005, the Chancery Court entered an Order dismissing the numerous petitions and motions. The parties were instructed to abide by the "Shared Parenting Provisions" of the Permanent Parenting Plan and to continue family counseling with Dr. Pickering.

On January 8, 2006, R. I. A. allegedly complained that her "bottom" hurt. Mother took R. I. A. to the emergency room at Parkway Regional Hospital in Fulton, Kentucky for an examination. The examination included a swab test, which proved to be inconclusive. Father claims that Mother made an additional accusation of sexual abuse the following day, January 9, 2006. Father contends that Mother made these accusations in order to avoid being deployed overseas with her National Guard unit.[4]

On January 10, 2006, Father filed a Petition for a Change in Primary Physical Residence on a Temporary and Permanent Basis and for a Restraining Order. The Chancery Court issued a temporary restraining order against Mother, prohibiting her from having contact with R. I. A. The trial court held several hearings in order to determine whether the change in custody should remain permanent. During the course of these proceedings, Julia Austin, the social worker who had been counseling R. I. A. through play therapy, testified that, based on her observations and interaction with R. I. A., she was of the opinion that sexual abuse had occurred. In direct contradiction to Ms.

---

[4] Mother was first taken off the deployment list following the first accusation in July 2004 and was honorably discharged following the accusation in January 2006.

Austin's testimony, Dr. Pickering, the psychologist who had counseled with both parties and the child, testified that he observed no indication of sexual abuse, and opined that Mother's leading questions and actions were geared towards furthering her own interests instead of the best interests of the child.

On January 11, 2007, the Chancery Court ordered that Father would be the Primary Residential Parent of R. I. A. permanently. The order further stated:

> . . . [T]he Court found a significant and material change in circumstances sufficient to warrant a change in custody and the court ruled that temporary custody of the minor child shall be with the father, David Steven Agee, and the mother should have supervised visitation through the Carl Perkins Center.
>
> It further appears that the psychologist, Dr. David Pickering, who was agreed upon by the parties to use in this case, testified that in his expert opinion he has not seen signs that the child has been sexually abused and further that Ms. Shearer Rebecca Agee has not been able to work toward the best interests of the child and that in his expert opinion there has been a material change in circumstances.
>
> . . .
>
> **IT IS THEREFORE, ORDERED, ADJUDGED, AND DECREED:**
>
> 1. That the Father, David Steven Agee, shall be the Primary Residential Parent of Rachel Agee on a permanent basis.
>
> 2. That the Mother, Shearer Rebecca Agee, shall continue to receive supervised parenting time twice per week at the Carl Perkins Center in Alamo, Tennessee. In addition, Mother shall telephone the minor child once during the week, and once each day on Saturday and Sunday pursuant to the Consent Order entered with this Court on February 13, 2006.
>
> 3. That the father's child support obligation ceased as of January 2006 and the mother is ordered to pay child support retroactive to January 2006. That the parties shall provide counsel with the following documentation in order to calculate child support pursuant to the guidelines, retroactive to January, 2006; 2005 and 2006 income tax returns, proof of health insurance premiums attributable to the minor child, and current wage information.

4. That a Permanent Parenting Plan should be entered which incorporates all of the above.

5. That the Mother, Shearer Rebecca Agee, was found to have not participated in the required counseling with Dr. Pickering in the last 4 ½ months and she is instructed to do so.

6. That this Order shall remain in full force and effect until further orders of this court.

## Issues

Mother appeals and raises seven (7) issues for review as stated in her brief:

1. Whether a material change in circumstances occurred to warrant modification of the Permanent Parenting Plan.
2. Whether relocation in the State of Tennessee, less than 100 miles, is a material change in circumstances.
3. Whether Dr. David Pickering, as an arm of the Court, is an unbiased, neutral advisor.
4. Whether the trial court erred in abdicating its decision making to a third party.
5. Whether this modification of the Permanent Parenting Plan violates T.C.A. § 36-6-112(c), the Protective Parent Reform Act.
6. Whether the trial court erred in admitting into evidence, and relying upon, a letter faxed from Dr. Pickering on January 23, 2006.
7. Whether this Court should award Mother attorney's fees and costs incurred to file this appeal.

## Standard of Review

This Court reviews findings of fact made by a trial court sitting without a jury under a *de novo* standard with a presumption of correctness for those findings, unless the preponderance of the evidence is otherwise. **Tenn. R. App. 13(d)** (2007). This Court reviews a trial court's conclusions of law *de novo* with no presumption of correctness. ***Union Carbide Corp. v. Huddleston,*** 854 S.W.2d 87, 91 (Tenn. 1993) (citing ***Estate of Adkins v. White Consol. Indus., Inc.,*** 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989). We note that the credibility of witnesses is a matter peculiarly within the province of the trial court. ***See Bowman v. Bowman***, 836 S.W.2d 563, 567 (Tenn. Ct. App. 1991). On appeal, we give great weight to the trial court's ability to assess a witness's memory, accuracy and truthfulness. ***Id.***

-6-

## Discussion

### *Material Change in Circumstances*

In child custody cases, the law is well established that when a decree awarding custody of children has been entered, that decree is *res judicata* and is conclusive in a subsequent application to change custody, unless some new fact has occurred, which has altered the circumstances in a material way, so that the welfare of the child requires a change of custody. ***Long v. Long,*** 488 S.W.2d 729 (Tenn. Ct. App. 1972). In short, once the trial court has made an initial determination with respect to custody, it cannot entertain a subsequent petition to modify custody absent a material change in circumstances, such that the welfare of the child demands a redetermination. ***See, e.g., Massengale v. Massengale,*** 915 S .W.2d 818, 819 (Tenn. Ct. App. 1995). A "material change in circumstances" justifying modification of a child custody order may include factors arising after the initial determination or changed conditions that could not be anticipated at the time of the original order. ***See Blair v. Badenhope,*** 940 S.W.2d 575, 576 (Tenn. Ct. App. 1996) (citing ***Dalton v. Dalton,*** 858 S.W.2d 324, 326 (Tenn. Ct. App. 1993)). If the trial court finds that there has been a material change in circumstances, it will then consider the petition to modify custody using a "best interest" standard.[5] ***Woolsey v. McPherson,*** No. 02A01-9706-JV-00125, 1998 WL 760950, at *2

---

[5]The factors are enumerated in T.C.A. § 36-6-106:

> (a) In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child. The court shall consider all relevant factors, including the following, where applicable:
>
> (1) The love, affection and emotional ties existing between the parents or caregivers and the child;
>
> (2) The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;
>
> (3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that, where there is a finding, under subdivision (a)(8), of child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37- 1-602, by one (1) parent, and that a nonperpetrating parent or caregiver has relocated in order to flee the perpetrating parent, that the relocation shall not weigh against an award of custody;
>
> (4) The stability of the family unit of the parents or caregivers;
>
> (5) The mental and physical health of the parents or caregivers;
>
> (6) The home, school and community record of the child;
>
> (7)(A) The reasonable preference of the child, if twelve (12) years of age or older;
>
> (B) The court may hear the preference of a younger child on request. The

(continued...)

(Tenn. Ct. App. Nov. 2, 1998). As this Court has previously recognized, there is a strong presumption in favor of the existing custody arrangement. *Smithson v. Eatherly,* No. 01A01-9806-CV-00314, 1999 WL 548586 at *2 (Tenn. Ct. App. July 29, 1999) (citing *Taylor v. Taylor,* 849 S.W.2d 319, 332 (Tenn. 1993)). The party seeking to change the existing custody arrangement has the burden of proof to show both that the child's circumstances have materially changed in a way that was not reasonably foreseeable at the time of the original custody decision, and that changing the existing custody arrangement will serve the child's best interests. *Geiger v. Boyle,* No. 01A01-9809-CH-00467, 1999 WL 499733 at *3 (Tenn. Ct. App. July 16, 1999) (citing *Smith v. Haase,* 521 S.W.2d 49, 50 (Tenn.1975.)); *McDaniel v. McDaniel,* 743 S.W.2d 167, 169 (Tenn. Ct. App. 1987); *Hall v. Hall,* No. 01A01-9310-PB-00465, 1995 WL 316255, at *2 (Tenn. Ct. App. May 25, 1995).

---

[5](...continued)

preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that, where there are allegations that one (1) parent has committed child abuse, as defined in § 39-15-401 or § 39- 15-402, or child sexual abuse, as defined in § 37-1-602, against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected to the evidence. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

(9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child; and

(10) Each parent or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child.

(b) Notwithstanding the provisions of any law to the contrary, the court has jurisdiction to make an initial custody determination regarding a minor child or may modify a prior order of child custody upon finding that the custodial parent has been convicted of or found civilly liable for the intentional and wrongful death of the child's other parent or legal guardian.

(c) As used in this section, "caregiver" has the meaning ascribed to that term in § 37-5-501.

(d) Nothing in subsections (a) and (c) shall be construed to affect or diminish the constitutional rights of parents that may arise during and are inherent in custody proceedings.

T.C.A. § 36-6-106.

Under this standard, the primary inquiry is whether there has been a material change in the child's circumstances.

Although there is no concrete definition for what constitutes a material change of circumstances, this Court has enumerated several factors that should be taken into consideration when determining whether such a change has occurred. In general, the change must occur after the entry of the order sought to be modified, and the change cannot be one that was known or reasonably anticipated when the order was entered. *Turner v. Turner,* 776 S.W.2d 88, 90 (Tenn. Ct. App.1988); *Dalton v. Dalton,* 858 S.W.2d 324, 326 (Tenn. Ct. App. 1993). In addition, the material change in circumstances must be a change in the child's circumstances, not the circumstances of either or both of the parents. *McCain v. Grim,* No. 01A01-9711-CH-00634, 1999 WL 820216 at *2 (Tenn. Ct. App. Oct.15, 1999). Finally, the change must affect the child's well-being in a material way. *Dailey v. Dailey,* 635 S.W.2d 391, 393 (Tenn. Ct. App. 1981).

Tennessee courts have based modification of child custody decrees on the following criteria: the character of the custodian; the conduct of the custodian; and the child's welfare. *Townshend v. Bingham,* No. 02A01-9801-CV-00019, 1999 WL 188290, at *4-*5 (Tenn. Ct. App. Apr. 6, 1999). The child's preference is only one factor to be considered in deciding custody. See T.C.A. § 36-6-106 (2001); *Wilson v. Wilson,* 987 S.W.2d 555, 564 (Tenn. Ct. App. 1998); *Helson v. Cyrus,* 989 S.W.2d 704, 707 (Tenn. Ct. App. 1998). The party seeking a change in custody has the initial burden to show a material change of circumstances which affects the welfare of the child. *Harris v. Harris,* 832 S.W.2d 352, 352 (Tenn. Ct. App. 1992). The burden remains on the moving party to show that he or she is comparatively more fit than the party with custody under the challenged custody decree and to show that it would be in the child's best interests for the moving party to be the custodial parent. *Gorski v. Ragains,* No. 01A01-9710-GS-00597, 1999 WL 511451 at *4, (Tenn.Ct.App. July 21, 1999) (citing *Nichols v. Nichols,* 792 S.W.2d 713, 715 (Tenn. 1990)); *Rust v. Rust,* 864 S.W.2d 52, 56 (Tenn. Ct. App. 1993).

As set out above, the trial court specifically found that Mother's subjecting R. I. A. to numerous exams constitutes a material change in circumstances. On appeal, Mother contends, *inter alia*, that this finding violates the Protective Parent Reform Act, **T.C.A. § 36-6-112.** Section 36-6-112(c) provides:

> If a parent makes a good faith allegation based on a reasonable belief supported by facts that the child is the victim of child abuse, child neglect, or the effects of domestic violence, and if that parent acts lawfully and in good faith in response to that reasonable belief to protect the child or seek treatment for the child, then that parent shall not be deprived of custody, visitation, or contact with the child, or restricted in custody, visitation, or contact, based solely on that belief or the reasonable actions taken based on that belief.

**T. C. A. § 36-6-112**

Mother argues that her concerns and actions were based on a good-faith belief that R. I. A. was being sexually abused by Father. Mother contends that R. I. A.'s behaviors and statements

provide an adequate basis for her to have a reasonable belief that Father was sexually abusing the child. Accusations of child abuse by one parent against another parent is one of the most difficult issues faced by the courts. ***Keisling v. Keisling***, 196 S.W.3d 703, 722 (Tenn. Ct. App. 2005). While we concede that any suspicion of sexual abuse is a grave accusation, which must be thoroughly investigated, the mistaken conclusion that a parent abused his or her child when, in fact, no such abused has occurred also has serious consequences. ***Id.*** Therefore, "any concern about reporting allegations of child sexual abuse must be balanced with the awareness that false accusations of such abuse can be a 'reprehensible tool' against an ex-spouse, remarkable for its 'brutal effectiveness.'" ***Id.***

In the instant case, Mother's accusations were investigated by DCS and law enforcement officials. Numerous tests and examinations were performed; yet, none yielded any sort of proof indicating that Father had sexually abused R. I. A. Professionals at LeBonheur evaluated the parties and declared that there was no evidence, nor any personality traits, which would indicate that Father was an abuser. In addition, Dr. Pickering testified that he observed no signs of abuse by Father, and further opined that R. I. A. is comfortable separating from her parents (something that a sexually abused child typically will not do). Concerning Mother's actions, Dr. Pickering testified that there was evidence to suggest that Mother "coached" R. I. A. into talking about events that did not actually occur, to wit:

> It's my opinion, from the work that I've done with the [parties], that [Mother] often does ask questions of the child and do things in a leading sort of way that results in the child possibly having some ill feelings toward her father, which may not - which do not appear to be warranted. The child does not have those feelings with [Father]. The child does not exhibit those feelings with [Mother]. But on two occasions I have been played tapes that involved [Mother] questioning the child in a way that encouraged the child to agree with her, whether what she was saying was true or not.

From our review of the record, there were at least four instances where the child was subjected to medical examinations, namely:

1. The visit to an emergency room and to the MRC in August of 2004;
2. At least one visit between August 2004 and January 2006 to the Jackson-Madison County General Hospital Emergency Room;
3. An examination by Mother's neighbor, a Registered Nurse, and,
4. A visit to Parkway Regional Hospital in January of 2006.

During these examinations, R. I. A. underwent visual inspections, in one occasion having her genitalia photographed, and she was also given numerous swab and blood tests. Father contends that Mother subjected R. I. A. to these examinations and tests in order to: (1) avoid deployment to Iraq, and (2) keep him from the child. Mother contends that her concerns were grounded in fact, that the tests and exams were necessary, and that they were only performed in the best interest of R. I. A.

Here, the trial court specifically held that the Mother is "in much need of counseling" and that the R. I. A. has been "subjected to four rape examinations of some sort or another in her young life." The trial court notes that R. I. A.'s exposure to these examinations (and the possibility future exams) would be potentially harmful for the child. In its order designating Father as the permanent Primary Residential Parent, the trial court held that a material change in circumstances had occurred. The trial court's finding was due, in part, to Dr. Pickering's statement that he had not "seen signs that the child ha[d] been sexually abused," and that the Mother "had not been able to work toward the best interests of the child."

In this case, it is clear that the accusations of sexual abuse were taken seriously and investigated thoroughly. After a full investigation, psychological evaluations, and numerous hearings, the trial court concluded unequivocally that Father did not abuse R. I. A. The record supports the trial court's finding that Mother's allegations were, in fact, false. Furthermore, there is sufficient evidence to support the trial court's determination that the numerous interrogations and intrusive examinations, to which R. I. A. was subjected, were fueled by Mother's hostility towards Father, and/or, by her desire to avoid deployment to Iraq. While we concede that Mother's intentions may have initially been based upon her care and concern for R. I. A.'s welfare, the sheer number of hospital and doctors' visits, and the fact that every test performed yielded no proof of abuse, should have given Mother pause. The record shows, however, that, despite the lack of proof, Mother continued to assert her position that Father abused R. I. A. The end result, *i.e.*, R. I. A. being subjected to the same invasive tests over and over, and Mother's insistence that R. I. A. was a victim, worked a significant and harmful disservice to the child's best interests. This is, indeed, a material change in circumstances.

As this Court has stated, "harm can result to a child when a parent's natural and expected protectiveness regarding the prospect of sexual abuse by the other parent goes beyond reason" and becomes obsessive hyper vigilance. *Keisling*, 196 S.W.3d at 723. Mother's persistent allegations against Father and her relentless quest for evidence of sexual abuse may very well have resulted in lasting psychological damage to the child. The trial court's decision to name Father as Primary Residential Parent is well-supported by this record, and this Court is satisfied that this change is in R. I. A.'s best interest.

*Dr. Pickering*

Mother also asserts that Dr. Pickering is not an unbiased, neutral advisor. Mother argues that Dr. Pickering has found fault with every action she has taken. Consequently, she contends that she "should not be required to counsel with Dr. Pickering and that he should not dictate any legal ramifications in this case." Although Mother argues Dr. Pickering's objection to her desire to moving that her desire to move to Fulton, Kentucky, was a personal attack, based upon the record, we disagree. Dr. Pickering testified that he did not believe the move would be in R. I. A.'s best interest because it would involve "moving from an area where [R. I. A.] was comfortable and knew the people around her to an unfamiliar situation." Dr. Pickering also voiced concerns about Mother

moving out of the trial court's jurisdiction. Dr. Pickering's concerns appear to be relevant and voiced out of concern for R. I. A.

On appeal, Mother also attacks Dr. Pickering's alleged bias and asserts that the trial court erred in its reliance upon Dr. Pickering's recommendations. Specifically, Mother takes issue with the trial court's allowing into evidence Dr. Pickering's January 23, 2006, opinion letter, in which he states, in relevant part, his recommendation that:

> [R. I. A. ] remain, for the time being, in her father's physical custody, but that she begin supervised visitation with her mother. Since her mother currently resides in South Fulton, with [R. I. A.]'s maternal grandmother, I see no reason why her grandmother cannot be included in the visits, should she and Mrs. Agee wish.
> . . .
> I would therefore recommend that the visits occur at the Exchange Club - Carl Perkins Center for the Prevention of Child Abuse, with Center staff providing the supervision.

We first address whether Dr. Pickering's letter was properly admitted. We afford the trial court wide discretion regarding the admissibility of evidence and will not overturn the trial court's determination absent an abuse of that discretion. *Tire Shredders, Inc. v. ERM-North Central, Inc.,* 15 S.W.3d 849, 857 (Tenn. Ct. App. 1999). The transcript indicates that Mother's lawyer conceded knowledge of the letter at the time it was introduced, to wit:

> The Court (to Mother's counsel, Ms. Scott): Have you seen this [Dr. Pickering's letter]?
>
> Ms. Scott: Yes, sir, Your Honor, this morning.
>
> The Court: Well, it appears the Court has already ruled about Dr. Pickering's recommendations on 12 December. Let's make this part of the record. It's a fax from Dr. Pickering.
>
> > (Evidence 1 was marked and filed, and is made a part of this transcript of evidence).

No objection was lodged at the time the letter was admitted. It is well-settled that objections to the introduction of evidence must be timely and specific. *See, e.g., Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 702 (Tenn. Ct. App. 1999). An evidentiary objection is considered timely if it is made either in a motion *in limine* or at the time that the objectionable evidence is about to be introduced. *See Wright v. United Servs. Auto. Ass'n.*, 789 S.W.2d 911, 914 (Tenn. Ct. App. 1990). It was not until after the lunch recess that Mother objected to the letter, to wit:

> Ms. Scott: Your Honor, during the lunch break, I had a chance to look over the letter submitted by Dr. Pickering that was admitted as an exhibit, and I noticed it was faxed to Attorney Spencer's office.

And I will not have the ability to cross-examine Dr. Pickering on this letter to Mr. Spencer.

The Court: You're talking about the letter dated January 23?

Ms. Scott: Yes, sir. I'd like to object to the admission of that based on that.

The Court: I guess I'll have to treat that as a court record since it's a letter to me. The objection will be noted.

Ms. Scott: Okay. I thought it was mailed to you, but I saw at the top that it was faxed to Mr. Spencer's office.

The Court: Exhibit 1 is a - - actually it was - - you're exactly right. Do we have the original?

Mr. Spencer [Father's counsel]: Judge, when I spoke with him Friday, he said, "I'm preparing the letter, and I will forward it to the Court." I said, "Okay. Here is my fax number if you'll also fax it to me," which was done this morning. I, in turn, called my office enroute from Brownsville to here and said, "When that gets here, make sure that you fax it over to Alamo so that I've got a copy." So, I don't know his other protocol on how he sent the other.

Ms. Scott: When we first started, I was handed it very quickly before it was entered, and I didn't catch that.

The Court: Well, when the original gets here, I'll rule that it's part of the court record. . . .

On appeal, Mother alleges that the letter should have been omitted because it contains hearsay. However, the sole objection lodged at trial, supra, was to the fact that the letter was a copy. A party may not argue for the evidence's exclusion based upon one evidentiary law at the trial level, and then advocate a different reason for the evidence's exclusion at the appellate level. **See State v. Dobbins**, 754 S.W.2d 637, 641 (Tenn. Crim. App. 1998). Having not made a specific or timely objection of hearsay at the hearing, Mother cannot be heard to complain on appeal.

Mother next argues that the trial court relied too heavily upon Dr. Pickering's opinions, and, in fact, abdicated its decision making role to the doctor. We disagree. At the January 23, 2006 hearing, the trial court made the following relevant statements:

It appears that the Court found that when you're talking about an allegation of this seriousness, the Court takes it very seriously, and has on all these hearing. Because of the complexity of this, is the reason this Court decided, rather than do a licensed social worker, let's have a psychologist or psychiatrist.

It further appears that the Court found that due to the complexity of this, this Court is satisfied that sending it to a child psychologist or psychiatrist, Dr. Pickering, was the appropriate thing to do in this matter.

It further appears that the Court found that we have a parent who is in much need of counseling. Now, which one of these two parents it is, this Court's going to have to take the position that it's going to continue going with the psychiatrist, Dr. Pickering. I'm going to take the directed advice of Dr. Pickering and leave the temporary custody with [Father], but I'm going to order that [Mother] and her mother have the right to start visiting with the child under supervision of the Carl Perkins Exchange Club until further orders of this Court.

It further appears that the Court found it extremely disturbing that this child has been subjected to four rape examinations of some sort or another in her young life. And the Court further found that to be potentially very harmful to the child and that is the reason that the Court is going to keep the Temporary Restraining Order in place, with the exception that [Mother] will have visitation rights to be supervised through the Carl Perkins Center.

At the conclusion of the same hearing, Mother asked the trial court whether she would be allowed to telephone the child. The following dialogue occurred:

The Court: Let's run that through Dr. Pickering. If he gives it the green light, I'd say yes. Be specific with the days and the times. Does your client still have her appointment with Dr. Pickering?

Ms. Scott [Mother's Counsel]: Yes, sir.

The Court: Well, she needs to tell him what's transpired here and about this telephone visitation and see what can be done.

Our review of the record reveals that the trial court relied not only upon Dr. Pickering's suggestions, but also considered the testimony of other witnesses. Specifically, the trial court placed great importance upon the testimony concerning the number and nature of examinations, to which R. I. A. was subjected.

The evidence adduced at the July 11, 2006, and November 4, 2006 hearings included the testimony from Mother, Father, R. I. A.'s maternal grandmother, Ms. Austin, and Dr. Pickering. The trial court also considered the report from LeBonheur, a letter from Dr. Herman DeBoard, a letter from Dr. Richard Spring, the Kentucky State Police Lab Report, and documents from the Carl

Perkins Center, as well as transcripts from prior hearings in this matter. The record simply does not support a finding that the trial court abdicated its decision making to Dr. Pickering. Mother also argues that the trial court erred in continuing to require Mother to attend counseling with Dr. Pickering. In support of her contention, Mother asserts, *inter alia*, that she does not live close to Dr. Pickering's office, that her schedule is not compatible with Dr. Pickering's office hours, and that she cannot afford counseling with Dr. Pickering. The record reveals that any conflict as to Mother's being counseled individually by Dr. Pickering has been resolved by the fact that she is now being seen by Dr. DeBoard.

However, Mother is still required to see Dr. Pickering periodically as part of her participation in R. I. A.'s therapy. In June of 2005, the trial court ordered that R. I. A. attend counseling with a licensed child psychologist, that the parties participate collaboratively in the child's therapy, and that the parties split the cost of the therapy. Additionally, Mother was directed to complete long-term intensive therapy with a licensed therapist skilled in dealing with personality disorders. Because Dr. Pickering has been working with R. I. A. and her parents since 2005, it appears that a change in the child's therapist, in order to accommodate Mother's wishes, would not be in the child's best interest. The participation of both parents in this therapy is warranted and necessary. Despite the inconvenience alleged by Mother, we do not find that the trial court's requirement that Mother participate in child's therapy with Dr. Pickering is an "impossible goal." Rather, Mother's inconvenience pales in comparison to the child's need for stability, continuity, and participation by both parents in her therapy. Mother's individual therapy needs are being met by Dr. DeBoard. The trial court's ordering Mother to continue her participation in R. I. A.'s therapy by Dr. Pickering is not overtly harsh when considered in light of the child's needs and interests.

### Conclusion

For the foregoing reasons, we affirm the judgment of the trial court. Mother's request for attorney's fees, pursuant to **T.C.A. § 36-5-103(c)**, is denied. Costs of this appeal are assessed to Appellant, Shearer Rebecca Agee, and her surety for which execution may issue if necessary.

 

_____
ALAN E. HIGHERS, P.J., W.S.